1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA :
                             :
 4                           :
                             :
 5       vs                  :    09-CR-272
                             :
 6                           :
                             :
 7   MARK A. CIAVARELLA      :
                             :
 8                           :

 9


10

        BEFORE:      THE HONORABLE EDWIN M. KOSIK
11
        PLACE:       COURTROOM NO. 1
12
        PROCEEDINGS: JURY TRIAL
13
        DATE:        WEDNESDAY, FEBRUARY 16, 2011
14

15

16
     APPEARANCES:
17


18
     For the United States:  GORDON ZUBROD, ESQ.
19                           WILLIAM HOUSER, ESQ.
                             MICHAEL CONSIGLIO, ESQ.
20
     For the Defendant:      ALBERT FLORA, ESQ.
21                           WILLIAM RUZZO, ESQ.

22

23

24

25
```

2

1          THE COURT:  Please sit down.  They have something

2    they want to put on the record here before we begin.  We will

3    do it here at sidebar.

4          (The following discussion took place at sidebar:)

5          MR. FLORA:  Your Honor, in light of the Court's

6    ruling on the use of the plea colloquy of Robert Mericle, just

7    to cover ourselves for purposes of the record, we would move

8    for the introduction of Defendant's Exhibit No. 1, which is the

9    actual plea transcript of Robert Mericle.

10         In addition, Your Honor, we will move for the

11   introduction of Exhibit No. 2, which is the plea transcript of

12   Robert Powell in which in that transcript Gordon Zubrod also

13   stated that the money paid to Robert Mericle was a finder's

14   fee.  As the -- as we indicated previously to the Court, we

15   have been trying to introduce this type of evidence to show a

16   party admission on the part of the government.  The Court ruled

17   we cannot read from the transcript specifically.  We will move

18   for the Exhibit of 2.1, which is the stipulation executed

19   between the government and defense, showing that those

20   transcripts are true and accurate copies.  They are not going

21   out to the jury.

22         We're just putting this on the record to cover

23   ourselves.  The next, Your Honor, with regards to the Court's

24   ruling dealing with the cross examination of Robert Powell,

25   when I began getting into the credit cards, the Court's ruling

3

1  with regards to the cross examination of Pat Owens, making

2  inquiries as to the monetary outlays to Robert Powell, and

3  based the evidence presented by the government in its case in

4  chief, I want to put on the record -- and recognizing the

5  Court's ruling that I --

6           THE COURT:  It is on the record.

7           MR. FLORA:  Yes.

8           THE COURT:  In light of the Court's ruling that I

9  cannot make inquiries into the extent of the outlays made to

10 Robert Powell the companies of him and Gregory Zappala showed

11 some type of embezzlement, showed those outlays existed between

12 2006 and 2008, to show that Robert Powell was concerned about

13 the audits being conducted by Gregory Zappala, the companies

14 that was jointly held by Robert Powell and Gregory Zappala, I

15 just want to renew the introduction of evidence, Your Honor, of

16 the following documents:  Defendant's Exhibit No. 30, which is

17 the American Express Card billings; Defendant's Exhibit No. 28,

18 which is a breakdown of the Financial Transactions of

19 Mid-Atlantic Youth Services; Defendant's Exhibit 29, which is a

20 breakdown of the financial transactions of PA Child Care;

21 Defendant's Exhibit No. 32, which are the bank statements of

22 Vision Holdings; Defendant's Exhibit No. 32.1, which is the

23 stipulation executed between the government and the defendant.

24 These records are business records maintained by these various

25 entities, and in addition, Your Honor, I would want to move

4

1   into the record Defendant's Exhibit No. 95, which is a breakout

2   of all of the monetary outlays from -- from Pennsylvania Child

3   Care and Western PA Child Care and from Mid-Atlantic Youth

4   Services, the various entities Robert Powell held in his

5   individual capacity which outlays almost $3 million.

6          In addition, Your Honor, had I been allowed, I would

7   have called -- if it necessary, I would have called the current

8   chief financial officer to testify as to what those outlays

9   were.  I could not get an agreement as to the business record

10  exception by the government.  And that would be -- that

11  breakout, Your Honor, would be Defendant's Exhibit No. 95.

12         MR. HOUSER:  Government has no objection to them

13  being included for purposes of the record.  Just by way of

14  brief response, it's the government's position that there was

15  no offer of proof that there was any good faith basis to

16  believe there was any theft going on that and this was a mere

17  fishing expedition.  That's why I think the Court has ruled

18  appropriately here.

19         THE COURT:  Does the government rest?

20         MR. HOUSER:  No, we have -- we have a rebuttal case

21  just to move exhibits.  That's it.  We're done.

22         THE COURT:  You're not --

23         MR. HOUSER:  No more witnesses.

24         THE COURT:  All right.  Then you rest?

25         MR. HOUSER:  Yes.

5

1          THE COURT:  Then you're going to rest?

2          MR. FLORA:  Yes.

3          THE COURT:  Okay.  Now, I wanted to tell you from the

4   time we had a conference as far as Gordon Zubrod's statement I

5   anticipated you were going to call him as a witness.  I did.  I

6   brought it up at one of our conferences that one of these

7   lawyers may be called.

8          MR. HOUSER:  Okay.

9          (The discussion at sidebar concluded.)

10         THE COURT:  It appears we are not going to have any

11  more evidence.  The government wants to move the admission of

12  certain records before they close their case.  If there's no

13  rebuttal, go ahead.

14         MR. FLORA:  Your Honor, the defense rests.

15         THE COURT:  Okay.

16         MR. HOUSER:  The government moves the following

17  exhibits, the first exhibit is -- these were exhibits referred

18  to in the cross examination yesterday.  4.38, which is a HUD

19  statement, a record of Pinnacle Group of Jupiter; 4.40,

20  operating agreement of Pinnacle Group of Jupiter, that is also

21  a Pinnacle business record; 4.42, the amended and restated

22  operating agreement -- that's a business record of Pinnacle;

23  17.3, business records of Citizens Bank; 17.4, business records

24  of Automobile City; 17.5, business records of Wyoming Valley

25  Motors; 17.6, business records of Wyoming Valley Motors.

6

1          MR. ZUBROD:  May it please the Court, the United

2   States rests.

3          THE COURT:  All right, ladies and gentlemen of the

4   jury, we are going to start the morning with closing remarks of

5   counsel.  First you'll hear from the government, and they will

6   reserve some time for rebuttal.  Then you will hear from the

7   defense, and then that will be followed by the Court's charge.

8          I told the jury privately they would be hearing more

9   words spoken today than they ever have throughout their lives,

10  but it's necessary.  I will try to be as accommodating as I can

11  by taking a recess after each of the closings and then during

12  the Court's charge.  If it exceeds the appropriate time, we

13  will take a recess in the middle of the Court's charge, and I

14  think you will find it more comfortable.

15         Now, if you guys are going to use those exhibits

16  again during your close, I have no problems.  But would you

17  mind putting them over there as I suggested in the beginning so

18  the jurors can look to their left?  Before you begin, systems

19  -- if they haven't already done so, are going to -- you have a

20  mic, which we didn't have for the opening statements, okay.

21         I would like -- -- I want to be able to see the

22  jurors, and I want to see the faces of counsel.  That exhibit

23  blocks your faces, not that's there any fear, but sometimes

24  there are facial expressions that communicate things, most of

25  them directed at me.  Please.

1          MR. ZUBROD:  May it please the Court, Mr. Flora, Mr.

2     Ruzzo, ladies and gentlemen of the jury.  On behalf of all of

3     us, Judge Kosik, Mr. Flora, Mr. Ruzzo and all of the members of

4     the United States team, we want to thank each one you for the

5     time and attention and effort you put into this case.

6          I said during the opening statements that this is an

7     important case.  It is important to Mr. Ciavarella.  He's been

8     accused of some of the worst acts that could be ever laid at

9     the door of a public official who is a judge.  He stands

10    accused of betraying the trust by the very people who elected

11    him.  It is charged that he sold himself and used his high

12    office as a judge for personal gain.  It is charged that he

13    took money through bribes, kickbacks, rewards and extorsion for

14    doing his job as a judge.

15         And in the process, as I mentioned to you in our

16    first statement when I appeared to you -- before you a week

17    ago, week and a half ago, that he hid that money, he turned his

18    office into a cash cow, into a money making machine, and he

19    then hid that money to avoid public and law enforcement

20    scrutiny.  It is important for Mr. Ciavarella to have his day

21    in court.

22         I told you in the opening statements that it's also

23    important to the citizens of Luzerne County and the

24    Commonwealth of Pennsylvania because their lives and the lives

25    of their children should only be put in the hands of public

8

1  officials who have honor and integrity as their lodestar who

2  wouldn't think of taking a bribe or extorsion or harming one of

3  their own children.

4          I told you that it was important to the victims in

5  this case, particularly the victims that did not appear today

6  but who appeared before Judge Ciavarella when he sat as

7  juvenile court judge and used his pawns and schemes to enrich

8  himself.  Finally, this case is important to the United States.

9  It's charged with a responsibility to ensure that every citizen

10 is protected from corrupt public officials.  Now, we're

11 confident that you know the key facts of this case.  You've

12 been listening attentively.  You got -- and I am not going to

13 spend my closing argument going through the minutia detail by

14 detail in retelling the story of what you heard over the last

15 week and a half.

16         Rather, what I am going to do is first lay out a few

17 principles to guide you in looking at the evidence and.

18 Secondly, to the extent that I have the time, I'm going to walk

19 you through some of the -- discuss the nature of the some of

20 the laws that you're going to have to apply and show how the

21 events and the evidence points and meets each element of those

22 offenses.

23         Now, virtually, all of the evidence of all of the

24 offenses have been agreed to, the effect on interstate

25 commerce, the need to have at least -- in excess of $10,000 of

9

1  federal funds in any year in which a program, the juvenile

2  detention services program, in which the criminal offense

3  occurred.  We've shown millions of dollars on every quarter of

4  every year.

5          The use of the mails to further the crime -- none of

6  these issues are in dispute.  I think Mr. Flora would agree and

7  will agree.  What the case boils down is the intent of the

8  defendant.  It boils down to a very few issues.  No. 1, did

9  Mark Ciavarella take kickbacks, bribes and rewards from Robert

10 Mericle?  No. 2, did he and Michael Conahan extort money from

11 Robert Powell and then did he try and hide the illegal proceeds

12 using money laundering?  Did he try to hide the illegal

13 proceeds by filing false statements with the Administrative

14 Offices of the Pennsylvania Courts, and did he try to hide the

15 proceeds by filing false tax returns?

16          Crimes committed by well educated people are a world

17 apart from the blue collar type crimes, the street crimes that

18 you normally see on television or in the newspaper.  Well

19 educated people tend to commit what is universally referred to

20 as white collar crimes.  Why does the law call it that?  First,

21 white collar criminals don't just run in and wave a gun and

22 grab the money and run.  As I said, they are very intelligent

23 people.  They move supplely.  They plan carefully.  They

24 execute the plan with precision.

25          They are able to disguise what are criminal

10

1   transactions and make them look normal and common place.  They

2   are able to play upon their standing in the community to

3   facilitate their crimes.  People in a high position of trust

4   are afforded a wide latitude.  That's what a position of trust

5   is all about.  A special trust is given you, and a broad

6   discretion is given to you to carry out your duty in public

7   interest.  And it is that discretion that a white collar

8   criminal who is a public official plays upon to commit the

9   crimes.

10          Now, there are four points that I want to use to

11  describe what the evidence is in this case and how to look at

12  the evidence:  Concealment.  Coincidence.  Cash and control.

13  These are principles that we instinctively know.  It's not

14  something you read in books.  It is something that you pick up

15  in the life experience.  It's really just common sense.  Take

16  concealment, for example.  The law acknowledges that

17  concealment demonstrates a consciousness of guilt.  And it is

18  evidence of consciousness of guilt that reveals the criminal

19  intent of the individual.  It is rarely criminal -- criminal

20  intent is rarely proven by direct statements of an individual.

21  It is rarely proven by documents they sit down and write laying

22  out what the scheme is.

23          As a matter of fact, most white collar criminals --

24  I'm sorry -- most white collar defendants, including this

25  defendant, readily said or say, sure, I did it, I just didn't

1  think it was a crime, I thought it was legal.  Intent is proven

2  by evidence of consciousness of guilt.  And concealment of the

3  activity graphically shows Mr. Ciavarella and his

4  coconspirator, Michael Conahan, well knew that what they were

5  doing was wrong.  Moreover as lawyers and judges, they very

6  well knew that what they were concealing was criminal.

7          Now, do you remember the meeting between Robert

8  Mericle and Mark Ciavarella in November of 2007 in then Judge

9  Ciavarella's chambers?  Do you remember Mr. Mericle came in,

10  Mr. Ciavarella held up a sign that says, are you wired, yes,

11  no?  Mr. Mericle went and checked no.  Mr. Ciavarella then took

12  him out of the chambers, took him into an empty courtroom.

13  They sat at a table and they spoke.

14          By this time, federal agents -- these federal agents

15  have hit the road.  They are -- they are collecting evidence.

16  They are seizing evidence.  They are interviewing witnesses.

17  They are issuing grand jury subpoenas.  The grand jury is

18  bringing people before it to hear evidence.  Mr. Ciavarella in

19  the midst of that -- he says to Robert Mericle -- he says, my

20  recollection is that you gave the finder's fee directly to me.

21  Mr. Mericle responded, no, it went through Robert Powell --

22  what you directed me to do.

23          And then Judge Ciavarella said, well, if you gave the

24  money directly to me, I'm going to get a slap on the wrist, but

25  if you gave the money to me through Powell, I'm going to jail.

12

1        Now, Mark Ciavarella is a judge, and he's a lawyer.
2    He knows that he's receiving an illegal kickback.  He knows if
3    it is discovered that he concealed that illegal kickback it is
4    indisputable proof of consciousness of guilt.  He knows it
5    proves his criminal intent to commit the crime.  He knows it --
6    he's a judge.  He knows his acts of concealment convict him.
7    So what does Mark Ciavarella do?

8        He tells Robert Mericle, I don't want you to lie or
9    obstruct justice but would you go back and look at your records
10   and see if maybe you gave the money directly to me and didn't
11   send it through Robert Mericle -- didn't send it through Robert
12   Powell.  Now, Robert Mericle testified he knew exactly what he
13   was being asked to do.  He was being asked to go back and alter
14   those records and lie to law enforcement when they came to
15   speak to him.

16       In other words, Mark Ciavarella's solution to his
17   criminal concealment of the kickbacks to -- from Mericle was to
18   have Robert Mericle criminally conceal his criminal
19   concealment.  And in that conversation with Robert Mericle,
20   Mark Ciavarella didn't just attempt to obstruct justice with
21   concealment.  He flat out admitted that the original act of
22   concealing kickbacks was driven by a consciousness of guilt by
23   a criminal intent to cover up his criminal acts.  If you gave
24   me the money through Powell, I'm going to jail to cover up the
25   fact he sold himself and his office.  That is powerful proof of

1  guilt in this case of concealment.  What were the acts of

2  concealment?  I will give you a few.  Remember the building of

3  PA Child Care.  The transaction was made to look as if all the

4  money went to Robert Powell.  Robert Mericle, a close personal

5  friend of Mark Ciavarella, who is his mentor, who he looked to

6  as a big brother for whom he lied to law enforcement and he

7  went to the grand jury.  Mericle testified, having been

8  prosecuted -- Mericle testified the idea to use Powell as a

9  conduit originated with Mr. Ciavarella.

10         Robert Powell when Ciavarella and Conahan told him

11  that the money was going to go through him as a lawyer, he knew

12  immediately he'd be put in the middle of an illegal kickback.

13  He knew immediately that he was facilitating a criminal

14  conspiracy.  He knew -- let me ask you this.  Why was Mark

15  Ciavarella so anxious to conceal Mericle payments?  The answer

16  is because he knew it was a kickback.  Why is it a kickback?

17  Judge Ciavarella in his efforts to get a facility for detaining

18  juveniles built in Luzerne County brought Robert Mericle to the

19  table.

20         Robert Mericle got the contract to build the

21  facility.  Having gotten the contract, having gotten the

22  reward, he went and gave -- he had gotten the money.  He gave a

23  reward from his profits to Judge Ciavarella.  Judge Ciavarella

24  knowing that the money was being kicked back to him from the

25  profits Mericle made accepted the payments knowing that it was

14

1   for his -- his discretionary acts as a judge in putting

2   together the team that helped build the youth detention center,

3   and he knew it.  Now, Judge Kosik will tell you in his

4   instructions that if you find the defendant accepted the

5   payment from Robert Mericle with the intent to be rewarded for

6   a decision already made, it does not matter that the payment

7   was not accepted until after the transaction.  You can't take

8   money as a reward for doing your job.

9          Judge Ciavarella was the juvenile court judge.  In

10  his capacity as the juvenile court judge, he took steps to have

11  a new juvenile detention center built.  If he couldn't get the

12  county to build it, then he was going to use his authority and

13  his position and his discretion as a judge to have it built

14  privately but for public use.

15         In his capacity as a judge, he got Robert Powell to

16  put together a team and to commit to get funds to go build it.

17  In his capacity as a judge, he brought Robert Mericle to the

18  table to build the facility.  Mericle had made millions by

19  building the PA Child Care facility, and he testified that he

20  gave Judge Ciavarella $997,600 as a reward for bringing him to

21  the table, which again led Mericle to making more millions.

22         This is a reward.  It's a bribe.  It is a kickback,

23  and it's illegal.  The bribery statute itself states that you

24  are guilty of taking a bribe if you, quote, corruptly solicit

25  or demand or accept or agree to accept anything of value from

1   any person intending to be influenced or rewarded in connection

2   with any business transaction or series of transactions.

3          Robert Mericle kicked back the portion of his profits

4   to Mark Ciavarella because without the judge he would not have

5   been brought to the table and he would not have made his

6   millions.  Robert Powell also played a role in that because

7   Powell was the conduit through which the money went to get to

8   Judge Ciavarella.  Now, we know why Mericle did it.  Why did

9   Robert Powell do it?  Because he correctly believed if he

10  didn't do it Judge Ciavarella exercising his judicial authority

11  and discretion would not have sent any children to PA Child

12  Care.

13         Robert Powell saddled with a $12 million -- later $25

14  million mortgage when Western PA Child Care was built would

15  have been ruined.  So regarding Robert Powell, when Judge

16  Ciavarella required him to become the conduit for getting

17  Mericle's money to him, he was demanding that Powell help him

18  get something of value.  Common sense dictates that Mark

19  Ciavarella intended to be influenced in the performance of his

20  job if the judges helped to get PA Child Care built and if

21  Powell played a concealment role in getting the moneys to them,

22  then Powell would get and PA Child Care would get the children

23  for detention and treatment.

24         For Mericle it was a reward, a kickback.  For Powell

25  it was a demand implicitly telling him if he didn't do it he

16

1   was not going to get the children sent to PA Child Care.

2   Another example of concealment of payments is there any greater

3   evidence of an attempt to concealment that blew up in

4   Ciavarella and Conahan's face than the rental of the

5   condominium down in Jupiter, Florida?  In about seven months

6   Robert Powell paid a total of $590,000 for rent of -- rental of

7   a boat slip and a condominium.  When he was already at that

8   same place, he had been paying for the rental of the boat slip.

9   And when Judge Conahan and Judge Ciavarella -- they didn't have

10  a boat slip to rent to him, yet he was paying them rent for a

11  boat slip.

12        The $590,000 covering seven months was purportedly

13  for the rental of a condominium that cost $785,000 in total.

14  Powell said that he used the condo twice in three years.  But I

15  don't care how many times he used it.  I don't care if he used

16  it every weekend.  Nobody -- and I mean nobody -- pays $590,000

17  in seven months to rent a condominium.  When you're

18  deliberating, look at the checks that Robert Powell wrote.

19  It's a scam on its face.  When you look at it, you will see

20  he's writing out checks to cover the same time period over and

21  over again, February, March, April, March, April, May, April,

22  May, June.

23        Additionally, Mark Ciavarella when he testified on

24  cross examination he acknowledged that even as late as May 2004

25  the condominium was nothing but a shell.  It was just -- it was

17

1   just walls, concrete floor, concrete everywhere.  It was a

2   shell.  It was unusable.  You couldn't live in it.  Yet when

3   you look at the checks, Robert Powell is writing checks for

4   February -- rental checks for February, for March and for April

5   for a shell.

6          On its face, this is a complete fraud.  It is an act

7   of concealment.  As Robert Matta -- do you remember the

8   Schuylkill County attorney slash accountant slash banker who

9   moved the money through his bank account?  He said, if I had

10  known that this was money that was going from PA Child Care and

11  a person associated with PA Child Care to the judge who is

12  going to be sending children to PA Child Care, I wouldn't have

13  touched it, I would have gone to the Supreme Court disciplinary

14  board about it and I probably would have gone to law

15  enforcement.  When I asked him why, he says because it's money

16  laundering.

17         Now, when you are trying to cover up a bribe or

18  reward or kickback or even extorsion in a financial

19  transaction, that is money laundering.  Mark Ciavarella

20  testified he had nothing to do with rental payments, that Mr.

21  Conahan handled the whole thing.  But under the conspiracy law,

22  if you find that Mark Ciavarella and Michael Conahan agreed to

23  accept kickbacks, rewards, bribes, extorsion payments, then the

24  act of one is chargeable to the other.  Mark Ciavarella's

25  central defense is, I didn't rob the bank, I just drove the

1  getaway car.  Well, it doesn't matter.  If you're aware of what

2  your coconspirator is doing and you agree, then your acts are

3  chargeable to him and his acts are chargeable to you.  And may

4  I just for a moment talk about the conspiracy statute?

5          Both Congress and the Supreme Court have repeatedly

6  said, repeatedly endorsed, repeatedly supported the use of the

7  criminal conspiracy statute for reasons that very obvious in

8  this case.  One criminal acting alone can do a lot of damage.

9  But two or more criminals acting together can do experientially

10  greater damage, and they can commit much bigger crimes.  Take

11  this case, for example.  Judge Ciavarella had the power in

12  deciding where to send children for detention and treatment,

13  but he didn't have the power to deal with commissioners.  He

14  didn't have the power to enter into contracts, but Judge

15  Conahan did.

16          Together they were able to pull off what alone they

17  would have been unable to do.  That's what the conspiracy

18  statute is designed to address.  It is designed to defeat

19  criminal combinations that are extremely hard to overcome

20  without being able to show that parties acting independently of

21  each other with the knowledge of what they're doing when the

22  other person isn't around but working toward a common goal can

23  be guilty of conspiracy.  That's just common sense the way

24  criminal conspiracies work.

25          And it is common sense -- it is a common sense way of

19

1 addressing secretive and powerful criminal organizations.  If

2 you find an agreement between Mark Ciavarella and Michael

3 Conahan to engage in the charged criminal activity, the act of

4 one is chargeable to the other.  In other words, Mark

5 Ciavarella's statement that he had nothing to do with the

6 rentals just doesn't wash.  It was his conduct.  He was raking

7 in the cash.  He knew where the money was from.  He knew that

8 it was disguised to look legitimate.  He admitted that on cross

9 examination.  He's guilty of extorting money from Robert Powell

10 and disguising it as rent, and he did it by conspiring with

11 Michael Conahan.

12          Concealment in tax records, the Administrative

13 Offices Pennsylvania Courts, if you take a look at the -- at

14 the AOPC records, you will note that it says that you have to

15 report any creditor, any interest in real estate, any gift, any

16 direct or indirect source of income, any financial interest in

17 any legal entity in business for profit, any office or

18 directorship or employment.  When you put together PA Child

19 Care, Western PA Child Care, W-Cat and all the other businesses

20 and even the condo and all the other businesses, that describes

21 about every financial relationship in this case.

22          And Mark Ciavarella concealed it because if anyone

23 found out about these payments, he would find himself sitting

24 where he's sitting today in a federal court.  Remember in cross

25 examination he said, okay, I didn't think anything was illegal

20

1  but I hid all the transactions, I admit doing that.  Why?  He

2  said to avoid all of this.  What is all of this?  It's a

3  federal criminal prosecution.  Another concealment is the tax

4  fraud where he hid the proceeds of the activity.  He hid the

5  Mericle payments through Powell.  He hid the Mericle payments

6  through Pinnacle Group of Jupiter.  He hid the Powell payments

7  as rent paid through Pinnacle Group of Jupiter.

8          He hid the Mericle and Powell payments on his

9  statements to the AOPC, and he hid them on his taxes.  He

10  didn't report one penny of the $997,600 from Mericle,

11  mischaracterizing later payments as rent.  That is concealment,

12  and it runs throughout the case.  In addition to concealment,

13  one of the -- the other ways of looking at this case is

14  coincidence.  And again, that's simply common sense.

15          All of us have had -- had the experience of one event

16  over here and one event over here and together and that event

17  changes anything about our lives.  You know, how did you meet?

18  Well, we happened to be standing at the same corner at the same

19  time and our eyes met, something like that.  Everybody has

20  experienced that.  But when critical events start lining up one

21  after the other, and when those critical events are critical to

22  arriving at a particular goal, then it is no longer

23  coincidence, it's a plan.

24          And when it happens in a racketeering case, it is not

25  a coincidence either.  It is a criminal plan.  Let's look a

1  series of remarkable coincidences that surrounded Mark

2  Ciavarella in this case.  From the time Mark Ciavarella became

3  a judge, became the juvenile court judge in 1996, he complained

4  to anyone who would listen about PA Child Care -- I'm sorry --

5  about the deplorable condition of the Luzerne County Youth

6  Detention Center.  He complained to the commissioners.  He said

7  it was unfit for children.  We heard in court that it was

8  dangerous to put children in there.  Using the authority of his

9  office, he set in motion the movement to build a new youth

10  detention center.

11       He -- we found out from the testimony that a juvenile

12  court judge has the absolute power to stop sending children to

13  the county detention center, to send them instead to any

14  contract facility that he chose.  But he didn't do a thing

15  until January of 2003.  Why?  By July 2001 Robert Mericle had

16  told Mark Ciavarella he had a whopping pay day coming as a

17  finder's fee as a reward for getting the contract for building

18  PA Child Care.  Mark Ciavarella immediately went over to the --

19  to Michael Conahan and offered to split the money with him.

20  Why?  Because Michael -- Mark Ciavarella needed Michael Conahan

21  because when Mark Ciavarella can control where children went,

22  Michael Conahan -- he needed -- he needed the power and

23  authority of the president judge to force the closure of the

24  county-run facility.  He needed the power and the authority of

25  the president judge to block any attempt on the part of the

22

1  county to build a new youth detention center.

2          Both Mericle and, as I recall, Powell testified that

3  he, Mericle, Ciavarella and Conahan all agreed that Powell

4  would not apply for financing until January of 2002 when Mike

5  Conahan became the president judge.  And when Michael Conahan

6  became the president judge in January 2002, that same month

7  knowing that a big pay day would await if PA Child Care got the

8  money and was built, Michael Conahan drew up a placement

9  guarantee agreement enabling Robert Powell to get $12 million

10 to build PA Child Care.

11         Suddenly in late 2002, Ciavarella and Conahan are on

12 television talking about the failure of the commissioners to

13 remedy the problem.  You heard Judge Ciavarella saying, it is

14 my job to make sure these children are rehabilitated, it is my

15 job to make sure they are in a safe place for rehabilitation,

16 it is my job -- or it's not my job to put them in a place that

17 is dangerous for them where they can get hurt.  He was using

18 his position as a judge to sell that.

19         And they were complaining about the Luzerne County

20 facility and about the failure of the commissioners to remedy

21 the problem.  Michael Conahan in 2002 chooses that very moment

22 to announce that no more children will be sent by Judge

23 Ciavarella to the Luzerne County Youth Detention Center.  He

24 also said there would be no more funding as of December 31,

25 2002 of the county detention center.  Why 2002?  Because Mark

23

1   Ciavarella and Michael Conahan by then knew that they would be
2   getting a big pay day not only if PA Child Care was built and
3   was in business but if it didn't have any competition within
4   Luzerne County for the business of kids.  The new county center
5   had to be blocked.  By 2002 Robert Powell, thanks to Michael
6   Conahan, had the money to build PA Child Care.  By 2002, Judge
7   Ciavarella and Judge Conahan knew that the county was going to
8   go ahead and try to build a new facility because Mark
9   Ciavarella and Michael Conahan knew that if they can force the
10  closure of the county facility, they can anticipate future
11  paydays through Powell because the reality of the timing of the
12  events was not a coincidence.
13          The fact that Conahan and Ciavarella would be on the
14  receiving end of hundreds of thousands of dollars, if and only
15  if it got built and if and only if PA Child Care didn't die on
16  the vine would prosper and if and only if PA Child Care got the
17  children from Luzerne County is intrinsically intertwined with
18  the sudden movement of shutting down the Luzerne County Youth
19  Detention Center and blocking every attempt by the county to
20  build a new county run center.  This is like an open wound that
21  cuts across all of the way across this case.
22          Now, you recall in September of 2002 President Judge
23  Augello removed Mark Ciavarella from being the juvenile court
24  judge, and he took that position himself.  The moment Michael
25  Conahan became the president judge in January of 2002 he

24

1 removed Judge Augello and put Mark Ciavarella right back into

2 that position.  The act of one is chargeable to the other.  Do

3 you see the concert of action that's taking place there?  This

4 is not a coincidence.  It is a plan.  Consider the coincidence

5 of the payments to Pinnacle Group.  Pinnacle Group didn't own

6 the condo until February of 2004.  Pinnacle Group had no

7 condominium until February of 2004.  Robert Powell started

8 paying his rent in January of 2004.

9          By January of 2004 the entire $480,000 that Mark

10 Ciavarella got had been spent.  It was gone.  Nothing was left.

11 They had only approximately three or four thousand dollars left

12 in their account.  And as Mark Ciavarella admitted during cross

13 examination, he was spending way more money than his salary

14 could bear.  And it was at that moment that the extorsion of

15 Robert Powell began.  Is that a coincidence?  Powell starts

16 putting rent and marina pay February, March, rental, April,

17 January, February, March and April rentals on the checks.  He

18 makes two payments of -- $35,000 and $50,000 in January and

19 February.  That's $85,000.  That money went to Cindy Ciavarella

20 as that came out during our case.

21          The closing of the condo was February of 2004.  Cindy

22 Ciavarella was not even a part of the Pinnacle Group of Jupiter

23 until March 2004, yet she was paid $85,000 in February --

24 January and February of 2004.  Is that coincidence?  The next

25 extorsion payment was on May 1st, 2004.  And shortly

1  thereafter, Cindy Ciavarella became a one half owner of

2  Pinnacle Group.  Cindy Ciavarella didn't become an owner until

3  March of 2004.

4         And yet, she received her share of the rental fees

5  before the condo had been completed, before she became an

6  owner, before Pinnacle Group even owned a condo.  Now, what's

7  going on here?  Essentially, Robert Powell bought Mark

8  Ciavarella and Michael Conahan -- gave them a free condominium

9  because you remember the contract was for -- they said the

10 rental contract was for $900,000 over five years for a $785,000

11 condo.  That was Powell's price that he had to pay to get

12 children sent to PA Child Care, a free condo for Ciavarella and

13 Conahan.  Step back and look at it.

14        A businessman utterly dependant on that judge for

15 business to be sent, the success of his business hung on

16 whether or not that judge sent children to his center, and he

17 keeps paying them and he keeps getting business, this is why

18 the Pennsylvania standards of ethics for judges say that you

19 cannot have any income outside of your own salary.  This is not

20 a coincidence.  It is a plan.

21        The same thing with Robert Powell's payments in 2004

22 and 2006.  Remember he paid rental in 2004 for the condo of a

23 shell.  He paid cash in February -- in 2006 for Fed Ex.  Why

24 not in 2003 and 2005, the years preceding the extorsion

25 payments?  If you look at Government's Exhibit 20.9, you get a

1  picture of it.  2003, they are flush.  2003 Conahan gets

2  $507,000, Ciavarella gets $480,000.  That number begins to drop

3  down afterwards, and then the payments start coming in from --

4  from Powell.  And then you get to 2005, and they are flush

5  again because they are getting a million dollars from --

6  actually $1.15 million from Mericle, and then it drops down

7  again.  You can see by the curve that -- that the extorsions

8  come in between after they blow through the money that was

9  given to them by Mericle.  That's when Mark Ciavarella in 2006

10  and Michael Conahan came to Robert Powell.

11          That's when Mark Ciavarella picked out -- pulled out

12  the piece of paper, and it had the amount of money that Luzerne

13  County paid to PA Child Care and Western PA Child Care, and

14  Mark Ciavarella said, I know how much money you're making, I

15  know you're making a lot of money and you can afford to pay us

16  and you owe me because I am the one who sent you the kids and

17  so you better start paying.

18          Now, that's extorsion under color of official right,

19  and Judge Kosik will read to you and explain to you what

20  extorsion under color of official right is -- will say in his

21  charge extorsion under color of official right means that a

22  public official induced, obtained, accepted or agreed to accept

23  a payment to which he knew he was not entitled knowing that the

24  payment was made in return for taking, withholding or

25  influencing official acts.

1          The government may show the benefit was meant to be

2   given to the public official directly or to a third party who

3   is not a public official but was acting in concert with the

4   public official.  This is not a coincidence.  It is a plan.

5   Mark Ciavarella buys a car on August 16th, 2006, the very same

6   day Robert Powell paid in cash one of the kickbacks or one of

7   the extorsion payments to him.  He goes out and puts down

8   $5,000 in cash to lease a car.  Where did the money come from?

9   When he was questioned on cross, he said that it didn't come

10  from extorsion, that came essentially from an illegal campaign

11  contribution that they gave to me at the golf tournament and I

12  just stuffed it in my pocket back in November 2005 and I've

13  been paying things out anytime I need to go to dinner or

14  something like that and I didn't want to go to the bank.

15          The -- and then do you remember -- here's the man who

16  remembers detail after detail.  He remembers a meeting on

17  October 16th, 2008 he remembers it because that was the day it

18  was a Penn State Michigan game and he was standing over a grill

19  out at the Penn State stadium and was cooking steaks when

20  Robert Mericle came back and he goes into detail -- minute

21  detail.  So the question Bill Houser asked him was, really, who

22  gave you that campaign contribution, who gave you that 15 or 20

23  that you stuffed in your pockets?  Do you remember what his

24  response was, I don't remember.  The man can remember

25  everything.  Suddenly he goes vague.  Is that coincidence, or

1  was it part of the plan?

2         What is racketeering?  Very briefly, racketeering is

3  you have to have an enterprise.  What's the enterprise here?

4  It is the Luzerne County judiciary.  And the enterprise is

5  simply the vehicle you get in to drive off to commit your

6  crime.  That's all it is.  You have to find there was some

7  vehicle they used.  The vehicle we are charging is the Luzerne

8  County judiciary.  I told you that earlier that racketeering is

9  like an umbrella offense.  Underneath it are all these

10 underlying offenses.

11        The underlying offenses are also called predicate

12 acts.  We've alleged dozens of predicate acts.  You only have

13 to find two.  And of all those acts there were two acts that

14 you have to decide were they part of racketeering activity.  In

15 other words, are they random acts, or do they fit together in

16 such a way that it was part of the pattern and that pattern

17 given the nature of the offense, bribery, kickback, extorsion

18 it was part of a racketeering activity and was it made possible

19 through the use of Conahan and Ciavarella's offices as judges.

20        The underlying -- these predicate offenses are all in

21 the same count.  Count one is the racketeering count.  All of

22 the predicate acts are in there.  After that comes the

23 racketeering conspiracy, and after that come a bunch of

24 individual counts that you have to look at and look at the

25 evidence and decide whether or not he committed them.  The

1  third feature common to racketeering is cash, which is obvious

2  and it is self-evident.  It covers money in any form, check,

3  wire transfer or cash.  It is one of the strongest proofs of

4  criminal intent is when a white collar criminal tries to

5  launder the money and clean it up to hide its origin and its --

6  its source.  It's called money laundering.  You heard Special

7  Brian Berentson testify as to the placement, the layering and

8  the integration of funds in a money laundering scheme.

9          And it is typical of criminal activity that dirty

10  money is often changed its character by going through banks and

11  businesses and so on to conceal the origin of funds, made to

12  look clean.  That's what layering is.  Now, look at some of the

13  examples of that.  The Mericle payments, the Mericle payments

14  to Mark Ciavarella and to Michael Conahan.  In each case there

15  was an attempt to mislead by mischaracterizing the nature of

16  the funds.

17          Each Mericle payment followed the direction of Mark

18  Ciavarella to make it appear as if the money went through

19  Robert Powell.  Mark Ciavarella who was well aware that Powell

20  wasn't going to get any of the money, and he clearly didn't

21  even though the paperwork made it appear that he had, and the

22  million dollar payment from the PA Child Care building and the

23  $150,000 payment that was the Western PA Child Care building

24  and the 150,000 for the PA Child Care expansion, that money is

25  paid to Pinnacle Group.  It's treated on the books of Pinnacle

1  Group as rent.  It's treated on Mark Ciavarella's tax returns

2  as rent.

3          Ciavarella knows well that it's a finder's fee from

4  Mericle.  It is not rent.  It is a reward.  He knew it was

5  illegal.  Each Mericle payment was disguised in different ways.

6  The reason -- we got lawyers and judges here -- they know it is

7  illegal.  They are well aware that the Mericle payments were

8  kickbacks and rewards for his exercise of judicial authority,

9  putting together a -- a private detention center for public

10 use.

11         They are well aware that they are disguising money

12 and moving it through the financial system and that it's money

13 laundering.  Lawyers and judges know what kickbacks and money

14 laundering is the same way that every doctor knows what an ear

15 infection looks like.  It is common knowledge.  These are

16 judges, Mark Ciavarella and his coconspirator, Michael Conahan,

17 attempts to clean up these transactions by making them look

18 like something they are not shows their criminal intent and

19 their consciousness of guilt.

20         Let's focus on the first transaction as an example of

21 the movement of funds.  These movements are clearly designed to

22 sever Robert Mericle from Mark Ciavarella.  First there was, I

23 recall, the registration and commission agreement that was

24 signed between Mericle and Powell which said that Powell was

25 getting all of the money and it was -- it was obviously false.

31

1        Then they take the $610,000 and it goes from -- from
2  Mericle Construction down to Robert Matta.  Robert Matta
3  transfers it down to Beverage Marketing of PA.  It then goes
4  from Beverage Marketing of PA in dribs and drabs, $330,000 goes
5  on January 28th, 2003, another 75,000 -- that's a check.
6  Another 75,000 is wire transferred to Mark Ciavarella's bank in
7  April of 2003.  And then in June -- July of 2003, another
8  $75,000 goes to Mark Ciavarella for a total of $480,000.

9        Look also at the $387,000 which goes from Mericle to
10  Robert Powell.  He holds it, and then as time goes by after
11  paying -- he pays the $10,000 to Matta, but he goes and he
12  takes the check -- he sends a check to -- from Vision Holdings
13  to Barbara Conahan, and, of course, it winds up going back to
14  Michael Conahan, and he winds up making $456,000.  Conahan pays
15  for the boat.  That's the difference between the payments.
16  Conahan pays for the boat expenses because he wants to use it
17  in the future, and it's kind of a peace offering.

18        When you stand back and look at the entire
19  transaction once you know that it is designed to get all of
20  that money to Mark Ciavarella and his coconspirator, then the
21  layerings here become ludicrous.  The only purpose is to hide
22  the money to take what is obviously dirty money and to clean it
23  up by making it look legitimate.  Now, another aspect that
24  sticks out in this case is what I refer to as control.  These
25  crime -- to pull these crimes off, you have to be a control

1  freak.

2        And white collar criminals choose areas of activity

3  -- criminal activity where they are in control.  You can see

4  and get just the barest glimmer of this and how Robert Powell

5  was treated when you look at how the attorneys were treated in

6  Michael Conahan's courtroom.  Do you remember that?  Mr.

7  Ciavarella -- when he -- I'm sorry -- in Mr. Ciavarella's

8  courtroom.  Mr. Ciavarella curtly cut off every attempt at

9  discussion.  He refused to discuss the law.  He refused to

10 follow the law.

11        He lied about his financial relationships with Robert

12 Mericle in one case and with Robert Powell in another case.

13 These people were parties or attorneys in the case.  He ruled

14 for the people who were giving him the money.  He was enraged

15 when he was asked by an attorney what his relationship was with

16 Robert Powell given the -- the unequal treatment this attorney

17 was experiencing in the court.  And he tried to intimidate that

18 attorney into silence.  That is control.

19        When he had the opportunity, Mark Ciavarella liked to

20 use his power and the power of the judicial office to step on

21 people.  He stepped all over Robert Powell with a cynical

22 brutality.  He had the power, and he used it to control people

23 to control events for his own purposes.  He and Michael Conahan

24 had the power to control the routes that the money took to get

25 to them.

1          Now, I'm not going to spend time discussing the tape.

2 You heard it twice.  All I'm going to say the most damming part

3 is on three or four occasions you will see in that tape that

4 Robert Powell in the presence of Mark Ciavarella and Michael

5 Conahan, they talk about the cash that he gave to Jill Moran to

6 give to them, and Ciavarella knows -- this is the Fed Ex boxes.

7 Ciavarella knows full well about the payments.  Powell talks

8 about the cash, and Ciavarella talks about ways to disguise it.

9 They discuss the cash on three or four or five occasions.

10          Ciavarella says, well, wasn't that -- were you taking

11 legal fees out, could you -- basically the suggestion was can

12 you make it look as if it was a legal fee.  He says, no, we

13 didn't do any legal fees, that lie isn't going to work.  And

14 they continued to talk about ways of disguising it.  And then

15 both Ciavarella and Conahan urged Powell to come to settlement

16 with Greg Zappala so there was no deposition and because they

17 feared the kickbacks are going to come out.

18          They are not worried, notice, about Zappala is going

19 it find out about the Mericle payments.  They are not worried

20 because Mericle, the lowest bidder, had worked it into his

21 building costs and in essence Zappala had agreed to it when he

22 agreed to the contract.  That was the best contract he was

23 going to get.  He took it.  They said it's not his money

24 because he agreed to that bid.

25          What has them scared is the money that Powell paid

34

1  them.  What money was that?  It was extorsion payments.

2  Ciavarella says -- and as a matter of fact, Mark Ciavarella

3  says that the Mericle payments are the least of their problems

4  in a criminal investigation.  What other criminal -- what other

5  problems are in the criminal investigation?  Extorsion, the

6  extorsion of Robert Powell.

7        And you can basically -- I think after Mark

8  Ciavarella left to go to check out the FBI van and try to get

9  into it and look into it and so on, Conahan was in full panic

10  as they are heading out the door, says to Powell, so long as

11  you stick to your story on the condo rent, okay, and he,

12  Ciavarella, solves this problem, the Mericle payment, if Jill

13  got boxes, she kept them and if you gave her stuff to give me,

14  it was the Lenahan docs, it was documents, it was maps, it was

15  anything.  You did things by courier, you never gave them to

16  her.  Everybody in the room -- in that room knew it was false.

17  But look how he's making it up on the fly, it was documents, it

18  was maps, it was anything.

19        What does Robert Powell -- well, if that's our story,

20  we will stick to it.  Conahan says we have to.  It is laughable

21  to say that Mark Ciavarella sat through the meeting discussing

22  how to conspire to commit perjury and come up with alternative

23  explanations for the money and turn around and say at this

24  trial he had no idea that criminal acts were being committed

25  and that these were extorsion payments when Mark Ciavarella was

35

1   the one who demanded the payments in the first place.  We are

2   confident you will draw the obvious conclusion.  I am going to

3   cut this off.  We -- when I began this trial, I told you that

4   Mark Ciavarella appears before you cloaked in the presumption

5   of innocence, that he doesn't have to prove a thing to you,

6   that the burden is at all times upon the United States to prove

7   every element beyond a reasonable doubt.  Well, that cloak has

8   been removed.  That presumption is gone.

9           It's been removed by the tape-recorded conversations

10  where he's in discussing the cash with Powell.  It's been

11  removed by the devastating cross examination by Bill Houser

12  when he got -- him to -- got Mr. Ciavarella to admit that his

13  spending habits were completely out of control and to admit

14  that he had paid Michael Conahan -- he split the fee with

15  Michael Conahan to pay Michael Conahan for his judicial acts in

16  getting PA Child Care built.

17          It's been removed by the obvious fact that the

18  finder's fee reward was for Ciavarella exercising his political

19  and his judicial authority.  It's a clear understanding that

20  Ciavarella would be sending children to PA Child Care if Powell

21  played along.  It's removed by the rent payment paying for a

22  shell of a condo.  It's removed by concealment, by coincidence

23  by cash and control.  This case has been proven beyond a

24  reasonable doubt.

25          The task will soon be yours to decide the fate of

36

1  former judge Mark Ciavarella.  I ask you to listen very

2  carefully to my colleague, Al Flora, to the instructions on the

3  law that you will get from Judge Kosik.  And then I will ask

4  you to find Mark Ciavarella guilty of every count in this

5  indictment.  Thank you very much again from all of us for your

6  attention.

7          THE COURT:  Okay.  Can we see just two counsel on an

8  administrative matter off the record?

9          (A discussion was held off the record.)

10          THE COURT:  We will take a very brief recess.

11          (A brief recess was taken.)

12          THE COURT:  Please sit down.

13          MR. FLORA:  Judge Kosik, Mr. Zubrod, Mr. Houser, Mr.

14  Consiglio, Mr. Ruzzo, Mark, and members of his family.  Gordon

15  Zubrod is right about one thing.  Any lawyer -- especially

16  including a prosecutor would be able to recognize a bribe or a

17  kickback.

18          MR. HOUSER:  Your Honor, I object already.  May we

19  approach sidebar?

20          THE COURT:  Yeah, if you have to.

21          MR. HOUSER:  We do.

22          (The following discussion was held at sidebar.)

23          MR. HOUSER:  He's already talking about -- it appears

24  to me that what he's going to do is say that Mr. Zubrod

25  indicated that -- what happened with Mr. Ciavarella, Mr. Powell

1   and Mr. Conahan that Mr. Zubrod offered the opinion that was

2   not a bribe or a kickback.  We have made the objection to that,

3   Your Honor.  It's ruled that that's not an admission by the

4   government, and he's going to make that argument right now.

5           MR. FLORA:  That is not correct, Your Honor.  That is

6   not the argument I am going to make.  What I am going to do is

7   refer to the Mericle plea, indicate Mr. Mericle has

8   acknowledged at the time of his plea he specifically

9   acknowledged that it wasn't a bribe or a kickback in any sense.

10  He acknowledged at the time of his plea he paid a finder's fee.

11  He's acknowledged at the time of his plea the judges did

12  nothing in their official capacity for him.

13          He acknowledged at the time of plea he simply

14  referred him for the construction of this project.  He

15  acknowledged at the time of his plea that he got the job

16  because he was the lowest bidder, and at the time of the plea,

17  the government did not object to those admissions.

18          THE COURT:  I think he has a right to say that.

19  That's argument.

20          MR. HOUSER:  Okay.  He started out by saying that --

21          THE COURT:  Gordon Zubrod should know the difference.

22  He's labeling this a bribe as an extorsion.

23          MR. HOUSER:  Correct.

24          THE COURT:  But he's saying at the time of Mericle's

25  plea the government didn't object to Mericle saying this is --

1          MR. HOUSER:  That is not a problem.  Once again what

2     we will do we will make a request for that instruction then

3     because we are talking about Mericle's intent.

4          (The discussion at sidebar concluded.)

5          MR. FLORA:  In fact, not only would any lawyer or any

6     prosecutor recognize what constitutes a bribe or a kickback,

7     but you don't have to be a rocket scientist.  Any contractor

8     would even know that.  Any lay person would even be able to

9     recognize that.  If you go back to the time that Mericle stood

10    in open court and made his plea of guilty before a judge and

11    that plea was under oath, he acknowledged with a prosecutor

12    standing there that this was not a bribe or a kickback, this

13    was a legitimate finder's fee, the judges did nothing in their

14    official capacity for him to get the job.

15         He acquired that job simply because the judges

16    referred him over to Powell and he got the job because he was

17    the lowest bidder.  That's what he acknowledged at his plea.

18    When he made those acknowledgements at his plea, the prosecutor

19    sat there, didn't say a word.  Robert Mericle came here into

20    court, testified under oath.  And I asked him -- one of the

21    very last questions I asked him, as you sit here today and

22    everything you know, was the money you paid a kickback or a

23    bribe.  And he gave you an unequivocal answer, no, it was not.

24    And despite that, despite that, the government comes here into

25    court today and argues an inconsistent position with that

1    evidence.

2         If Robert Mericle on that stand was not truthful

3    about this not being a kickback or a bribe, why didn't the

4    government challenge him?  Why didn't the government say to

5    him, Mr. Mericle, how can you say that in light of all these

6    circumstances?  They didn't challenge him because they

7    couldn't.

8         So today my client is now faced with fighting

9    inconsistent positions taken by the government.  Members of the

10   jury, that is wrong.  1995, when Mark Ciavarella was elected

11   judge his power and authority was limited by the office that he

12   held.  He didn't have the authority of the district attorney of

13   a county.  He didn't have the authority of a state police to

14   enforce the laws.  He didn't have the authority of the office

15   of the attorney general of the state.  He was a low common

16   pleas judge in one county in Pennsylvania.  That was it.

17        When he was elected in 1995, he had one motivation,

18   one goal, one dream, and that was motivation, goal and dream

19   that wasn't dictated at that time by Robert Mericle or Robert

20   Powell.  They weren't even heard of at that point.  And that

21   was to argue publically for the development of a new juvenile

22   detention facility to be owned by the county.  That's what he

23   wanted.  There was no conspiracy at that point.  There was no

24   claims of finder's fees.  None of that existed back then, and

25   that is what he continually argued for and got nowhere.

1            If he was a man of such great power, of stature as

2    the government would have you suggest, that facility would have

3    been built, but it never was.  Mr. Zubrod in his opening tried

4    to lead you to believe that the closing of the county juvenile

5    detention facility was improper because it was a licensed

6    usable facility and the closure of this licensed usable

7    facility was part of this grand scheme.  You heard Paul

8    McGarry.  You heard what he said.  When I asked him if I

9    described that juvenile facility as a dump, would that be a

10   correct characterization, he said, no, it was far worse than

11   that.  The conditions were deplorable.  And the actions of Mark

12   Ciavarella to try and close that facility, to take steps to

13   argue for the existence of a county facility had nothing to do

14   with Robert Mericle and the payment of a finder's fee.

15           His intent, Mark's intent, Mark's motivation existed

16   long before he had any meetings with Robert Mericle.  The two

17   were unrelated.  When Mark Ciavarella couldn't get the county

18   commissioners to build a facility, he took steps not in his

19   judicial capacity as a judge.  In his judicial capacity as a

20   judge he's limited to when people come before him and he has to

21   make decisions.  He took steps at that point in time to go see

22   Mike Conahan and say, Mike, if you know people out there in the

23   business word, put some people together to see if a private

24   development can be done because the county won't do anything

25   for our kids.

1          That request was pure.  That request was innocent.
2    There was no evil motive or intent in that purpose whatsoever.
3    You heard testimony that Michael Conahan had outside
4    businesses, which he was allowed to have, and that's why Mark
5    Ciavarella went to Conahan because he had these outside
6    business interests because he knew these people, and Conahan
7    put a group of people together in a room in 2000 to try and do
8    the right thing, the Minoras, the Joyces, Bob Powell.  They
9    were trying to develop a regional juvenile facility.  There was
10   nothing wrong with that, nothing whatsoever.

11         They weren't acting in their judicial capacity as a
12   judge -- as a sitting judge.  The government wants you to
13   believe that this whole conspiracy occurred sometime July 2001
14   when Robert Mericle came to Mark Ciavarella and said to Mark
15   Ciavarella, Mark, I am going to pay you a finder's fee.  The
16   government wants to believe this whole conspiracy started
17   somewhere around July of 2001 when Robert Powell supposedly had
18   a meeting with Mark Ciavarella and Michael Conahan and talked
19   to them about the existence or the need for a guarantee
20   placement agreement.

21         If you look at the facts and you look at the records,
22   you're going to find the sequence of events to which they are
23   alluding to does not make any sense.  Number one, why would
24   Robert Powell approach Mark Ciavarella in July of 2001 and
25   indicate to him that he was going to get a finder's fee at that

42

1    point when, number one, the land for the facility wasn't even

2    bought.  They didn't know where the facility was going to be or

3    if there was going to be a facility at that point.  Number two,

4    they didn't even have the financing in place at that point.

5    Number three, Robert Mericle didn't even have a signed

6    construction contract at that point assuring him that he would

7    get the job.

8         So how could it be in July of 2001 that Robert

9    Mericle would go to Mark and say to Mark, you're going to get

10   this finder's fee when none of those things are in place?  The

11   other thing, Robert Powell, in July of 2001 -- why would he go

12   to Mark Ciavarella and Mike Conahan at that point and say to

13   them, here's a copy of a guarantee placement agreement, I need

14   this signed?  He wouldn't even know at that point what the

15   requirements are of the bank that's going to give the

16   financing.

17        They didn't even have the land picked out at that

18   point.  It makes no sense that those meetings could have even

19   happened at that point in time.  If you look at the S&T Bank

20   loan commitment agreement dated the latter part of January

21   2002, you're going to find that that agreement requires a

22   number of things including a 20-year guarantee placement

23   agreement, a detention center operating agreement.  You're

24   going to find those things in that guarantee agreement which

25   they didn't even know about in July.

43

What makes sense is after -- after they get the S&T Bank commitment letter, that's when they go to Michael Conahan, and that's when Bob Powell says to Michael Conahan, I need a guarantee placement agreement. You heard Mark Ciavarella testify that he wasn't in that meeting and that Mike Conahan signed that agreement on his own. Once that agreement was signed, that agreement in many ways was no different than what other judges in the other part of the state have done with regards to financing of Western PA Child Care, and you will see documents signed by president judges of other counties guaranteeing placement of children at the Western PA Child Care facility.

It was utilized for financing purposes only, and quite frankly the document signed by Judge President Conahan of a million a year, that was a far better deal than what the county signed in terms of the lease in November 2004. Bob Powell never testified that either Mike Conahan or Mark Ciavarella tried to strong arm him to hire Robert Mericle. There is no testimony on that. There's no testimony that Mark Ciavarella or Mike Conahan tried to influence Bob Powell in any way in hiring Robert Mericle for that job.

The only testimony that you have in court before you is that Robert Mericle got that job because he was the lowest bidder and because Mark Ciavarella simply as his friend referred him to Bob Powell. You got to remember something

44

1  here.  If a person is elected a judge, is that doesn't mean

2  they are a judge 24 hours a day.  That doesn't mean that you

3  don't have friends, they don't have private lives.  That

4  doesn't mean they can't refer somebody for a job or something

5  like that.  When they do those things, they are not acting in

6  their judicial capacity.  They are acting as people, civilians.

7  Their roles are limited, and their role is limited to when they

8  take the bench and they make decisions, and that is it.

9       The government refers you to the meeting when Robert

10  Powell goes to Mark Ciavarella's office -- Mericle goes to Mark

11  Ciavarella's office and they have discussion at that point in

12  time about these commission agreements and what was said.  You

13  have to remember something.  At that point Mark Ciavarella was

14  livid with Robert Mericle.  He was livid from the standpoint

15  that Robert Mericle might have done something which wasn't

16  correct and wasn't truthful.  Mark Ciavarella was concerned

17  that if there was anything done other than to show that

18  commission agreement was going to him that that was wrong.

19  That's what he was concerned about in that meeting.

20       And that's why he told Robert Mericle as he was

21  leaving, yes, take a look at your records but remember one

22  thing.  Don't lie to the government.  Don't lie.  That doesn't

23  suggest any attempt to cover up anything under any

24  circumstance.  Mark Ciavarella tells you the first time he

25  believes the meeting occurred when he finds out about this

45

finder's fee is in April of 2002.  And if you look at the
sequence of events, that's what makes sense because it is by
then that the land is bought, that the financing is placed in
place and Mericle has a construction agreement in hand, and
that's when he would go to Mark Ciavarella and tell him about
the finder's fee, not before.  When he went there and told Mark
Ciavarella, Mark Ciavarella says, yes, I went to Michael
Conahan, told Michael Conahan about it and I gave him a portion
of it not because somebody was trying to do something
underhanded but simply because Michael Conahan originally got
the people together to try and arrange for the development of a
private facility.  When Michael Conahan did that, he was not
acting in his judicial capacity.  He was acting as a citizen
trying to do those things.

        For you to find a bribe or a kickback, you would have
to say to yourselves that Robert Mericle's statements at the
time of his plea that there was no bribe or a kickback,
statements which he made under oath and admitted to was a lie.
You would have to find that his testimony here where he said
there was no bribe or a kickback is a lie.  You would have to
find that it's all right for the government to walk in with
inconsistent positions.  I suggest to you, members of the jury,
you can't find those things.

        It's Robert Powell.  The government's entire theory
with Robert Powell rests on his state of mind, what he thought

46

1  these judges would do to him.  You saw him on that witness
2  stand.  You saw how I tried to cross-examine him.  You heard
3  his words on that wire.  Do any of you really believe that
4  anybody can push that man around, that anybody can bully that
5  man, that anybody could extort that man?  I suggest he can't be
6  extorted.  He tried to make you believe that Mark Ciavarella
7  and Mike Conahan were the two most powerful people around, that
8  they can do things the state police couldn't even do, that they
9  had more authority than the attorney general.  Members of the
10 jury, that's ludicrous.

11         That makes absolutely no sense.  And what proves it
12 makes no sense is when you actually look at the conduct of
13 Robert Powell supposedly when this extortion is going on, which
14 conduct by the way, is undisputed in this court.  Robert Powell
15 while the extorsion is going on, 2004, 2005, where does he take
16 his family for vacation?  To the very condo owned by the people
17 extorting him.  That makes no sense.  2005, Mark Ciavarella's
18 retention campaign -- the night of the election, who was at his
19 house -- at Mark's house?  Robert Powell at the same time he's
20 supposedly being extorted.

21         2005, graduation presents being given to Mark's
22 children while he's being extorted.  That makes no sense.
23 2004, through 2006, that period of time every Friday according
24 to Jill Moran he's over Mike Conahan's house having drinks.  If
25 you're being extorted, why would you even be doing that stuff?

47

1  2006 in the summer Bob Powell and his family are at Mark

2  Ciavarella's house, and they are swimming.  They are having a

3  good time.  They are drinking beer.  If you're being extorted,

4  would you engage in this type of activity with the very people

5  that are extorting you?  I suggest, members of the jury, that

6  makes absolutely no sense.  It's not credible.  And, in fact,

7  it's ludicrous to suggest you would be extorted under those

8  types of circumstances.

9         There's testimony that Bob Powell, end of '04 tried

10  to get away from them by taking his boat to Costa Rica.  Well,

11  the extorsion supposedly started in the beginning of '04.  Why

12  didn't he move his boat out sooner?  Why did he wait a year?

13  When he goes to Costa Rica, who winds up going down there with

14  him?  The very person that is extorting him, Michael Conahan.

15  Why?  You want to get away from me, you want to get away from

16  the person that's extorting you, and the person who is

17  extorting you wouldn't be going on that trip with you.  That

18  makes no sense.  You heard testimony from Mark Ciavarella

19  basically indicating that even when -- when Robert Powell

20  pulled the boat out of there he a left small boat at a nearby

21  marina.  He gave Mark Ciavarella the keys.

22         If you are being extorted, you don't do things like

23  that.  That's what doesn't make any sense about this.  It

24  doesn't make any sense about what Powell is saying.  I want to

25  talk to you a little bit about the wire.  We had that wire

1  played for you without interruption so we can get the full

2  flavor of what was being said there so you can get a full idea

3  of the content the way things were happening, and that's why we

4  played that wire to you.  There's a couple things about that

5  wire that I want to point out to you.  When Mark Ciavarella is

6  talking about Robert Mericle and what Robert Mericle may have

7  said to a federal grand jury, Mark Ciavarella was basically

8  taking the position, hey, Bob Powell, that wasn't your idea,

9  this was a legitimate finder's fee that was paid, I thought it

10 was legal.  There's no story there.  There's no makeup there.

11 When you listen to the words of those people surrounding that,

12 Mark Ciavarella was livid that Bob Powell was being wrongfully

13 accused of something and that's why he was livid.  He knew if

14 Rob Mericle was going into court and saying this was Bob

15 Powell's idea, he made this whole thing up, he knew -- Mark

16 knew that wasn't true.

17         There's no story there.  At one point during the

18 wire, and this is where it gets interesting, Conahan asks Mark

19 Ciavarella to leave the room.  If this is a conspiracy,

20 something is going on, why do you ask him to leave?  Why?  When

21 you look at what was said once Mark left, Conahan at that point

22 and Powell -- they start talking about Jill Moran.  They start

23 talking about boxes of cash.  They start talking about their

24 story.  They start acknowledging that Mark doesn't know about

25 how the rent is set up, and they say -- Conahan says, Mark is

49

1  our most credible witness because he doesn't know these things.

2  He doesn't know these things.

3           Members of the jury, there was something going on.  I

4  suggest to you there was a backroom deal going on between Mike

5  Conahan and Bob Powell and Mark Ciavarella had no idea what was

6  occurring.  Remember Jill Moran?  She testified that Bob Powell

7  told her that the boxes were to go to Mike Conahan, never

8  mentioned Mark Ciavarella.  There was no testimony -- they

9  lived side by side.  There's no testimony here she was

10  instructed to take any boxes to Mark.  There was one thing in

11  particular in that wire that is said at the very end, it gives

12  a strong indication that Conahan and Powell had something

13  going.  It was this.  Conahan:  "And listen, you got to pull

14  Greg back, sell these things and say, Greg, whatever I owe you,

15  I owe you, and you and I will figure something out in the

16  future."  There was something going on between those two

17  people.

18           When you look at the checks from Vision Holdings, the

19  way checks were made out, Mark Ciavarella had nothing to do

20  with that.  Pinnacle Group was Conahan's idea.  Mark was not

21  involved in the initial setup .  He came up after the fact of

22  his wife.  When the first payments were being made by Robert

23  Powell, Mark and his wife weren't a member of the corporation

24  at that point in time.  Something is going on there.  I further

25  suggest there was something going on between Conahan and Powell

50

is the testimony of Gina Carrelli, which went undisputed where she said Bob Powell -- she had known for a long time, had made statements that he was putting his money into that condo and he is an owner of that condo.  Bob Powell wasn't an owner of that condo.  He was Conahan's silent partner unbeknownst to Mark Ciavarella.  Mark Ciavarella never knew what was going on there, and she gave you a further reason as to why he was a silent partner.  That's because he was planning to leave his wife and he didn't want his name on anything and he was using that corporation to funnel money through.  That's what is happening here.

The prosecution has every opportunity to recall Robert Powell.  They let it go.  They let it go.  They want you to believe that Robert Powell was this meek man, can't stand up to anybody, who has no influence in the community.  And Gina Carrelli told you the extent of the influence and power he had. She told you about the time she went up to the Hazleton airport and drove to the tarmac to pick up her fiance who was a pilot on a plane Robert Powell used, and when she got there she was about 20 feet away and she saw Robert Powell handing two large envelopes of cash to a high ranking state official.

This was a -- in November 2006, the very time -- the very time Robert Powell says he is getting extorted and is paying cash to Mike Conahan and Mark Ciavarella.  They could have put Robert Powell back on to dispute that.  They didn't do

1    it.  That testimony is uncontradicted here in court.  Robert

2    Powell is no coward.  He was a strong man.  He was not one to

3    be easily extorted under any circumstances.  The government is

4    standing on thin ice, but it's cracking all around because no

5    matter what they try and do about the way money was

6    transferred, about money not being disclosed, they can't get

7    around two things.  The admissions Robert Mericle made at the

8    time of his plea that it was not bribe or a kickback,

9    admissions he made here in court and the ludicrous -- the

10   ludicrous position taken by Robert Powell that Mark Ciavarella

11   and Michael Conahan had so much power, he was afraid of them.

12   Mark Ciavarella couldn't do anything to Robert Powell.

13        He had contracts in place from 2003 on forward with

14   the county.  By November 2004 he had a 20-year lease with the

15   county.  Members of the jury, you heard all of those other

16   contracts that I read in through counties throughout the state

17   as well as outside of the state.  Mark Ciavarella didn't do

18   anything to undermine those contracts.  Robert Powell wants you

19   to believe that Mark Ciavarella or Mike Conahan had the ability

20   simply to pick up the phone and call somebody and all of a

21   sudden he would just lose all this business, all these

22   contracts would be cancelled.  He would be put out of business?

23   That makes no sense under any circumstance.

24        Mark Ciavarella and his family, this is the most

25   important day in their lives.  We understand that you as jurors

52

1   want to do the right thing.  You're here to promote justice.

2   But this is not a case about whether Mark Ciavarella violated

3   the judicial canons of ethics.  You are not here to decide

4   that.  You are not here to decide whether he should have put

5   his financial information on a disclosure form that he filed

6   with the Administrative Office of the Pennvania Courts.

7   You're not here to decide those things.  Those are ethical

8   matters left to other bodies.  You are here to decide two

9   things, kickback or bribe or extorsion.  Why was the money

10  paid?  If it wasn't a kickback or a bribe or wasn't an

11  extorsion, how that money was transferred doesn't mean a thing

12  because it was legal money.

13          Whether he put information down on disclosure forms

14  doesn't mean a thing because that doesn't constitute a crime.

15  Mark Ciavarella told you the things that he did wrong.  He told

16  you that he did commit income tax violations.  And he was up

17  front with you about that.  The commission of income tax

18  violations doesn't mean he took a bribe or a kickback.  It

19  doesn't mean he extorted Robert Powell.

20          Based upon the evidence presented, I suggest to you,

21  members of the jury -- in fact, I ask you to find Mark

22  Ciavarella not guilty on any charges relating to bribery,

23  kickback, extorsion, racketeering because the prosecution has

24  not proven their case beyond a reasonable doubt, which is the

25  highest burden of doubt that our system of justice has.  Thank

53

1   you.

2          THE COURT:  Thank you.  The government reserved some

3   time for brief rebuttal.

4          MR. ZUBROD:  Thank you, Your Honor.  Very briefly,

5   ladies and gentlemen, I won't be long, but I need to respond to

6   this.  Mr. Flora talks about this side deal that apparently

7   existed between Mr. Powell and Mr. Conahan.  Well, Mr. Flora

8   implicitly acknowledges, yes, there was an extorsion going but

9   the people doing the extorting -- it was Conahan and he was

10  doing it to Powell.  Well, if Conahan was the one who had some

11  side deal with Powell at the same time he was getting money

12  from him, why did he need Ciavarella?  He needed him because

13  the whole hammer that was held over Robert Powell and his PA

14  Child Care and Western PA Child Care was that Ciavarella was

15  the one with the power to send kids to PA Child Care.

16          As a matter of fact, the -- the -- he could have cut

17  him off at any time.  Remember the amount of money that is

18  being sent that Pat Owens said in those -- in the years PA

19  Child Care and Western PA Child Care were sent -- and

20  Mid-Atlantic Youth Services got over $30 million from Luzerne

21  County.  That's what gets cut off, and if -- they say that the

22  contract is set with the county.  They have the power to come

23  in and cut that off any time.  Robert Powell said he didn't

24  think the contract was enforceable because they can come in and

25  terminate based on what they perceive the best needs of the

54

1   child.  This thing about the Mericle plea, Mericle was

2   consistent with what he said in his plea.  At trial when he

3   kept saying, you didn't think -- he was being cross-examined --

4   you didn't think this was a crime, you didn't think this was a

5   bribe, you didn't think this was a kickback and Mericle kept

6   saying, to me, I was giving Judge Ciavarella a reward that I

7   thought was legal.  Whether it was legal, to me I thought -- I

8   thought it was legal -- whether it was legal for Judge

9   Ciavarella to take it, I'm not a lawyer, I don't know those

10  things.  And just about anybody in law enforcement and public

11  office including myself could testify to the fact that you go

12  in all the time to places and are told, this is on us, thank

13  you for what you're doing.  Every time you got to go back and

14  say, I know you don't think anything is wrong with this, but it

15  would be a crime for me to take that money.  So the issue is

16  not -- the issue at the plea was what was in Mericle's mind.

17          This was Mericle saying what he did.  The Mericle

18  plea, Mericle stated that it was his intent to -- to give a

19  reward and he does that in private business all the time and

20  private business.  There's nothing wrong with that.  He wasn't

21  stating what was going on in Judge Ciavarella's mind.  He was

22  stating what was going on in his mind.  And I note that they

23  keep hammering on that first moment when he gets Robert Mericle

24  and Robert Mericle comes to him -- look at all the things

25  surrounding it after that.  Let's use Powell as a conduit.

55

1  It's clear Judge Ciavarella knows he's getting an income that

2  he has no right to and that there is an aspect where he is as a

3  judge going ahead and he is performing acts which ultimately

4  get the child -- the PA Child Care built, youth detention

5  center in Luzerne County that the public is about to give $30

6  million to.  That's not using his judicial authority to do it?

7          Mericle when he said no quid pro quo and so on, do

8  you remember Mericle did not plead to a bribery charge which

9  would be a quid pro quo?  He pled to covering -- helping cover

10 up knowing -- getting involved with Ciavarella knowing that tax

11 fraud was being committed.  There's no quid pro quo in tax

12 fraud, but there is in bribes.  He didn't plead guilty as to

13 bribery or kickbacks.

14         Lowly common pleas judge in one county?  They try to

15 make you believe he's more powerful than the Pennsylvania State

16 Police, more powerful than the deputy attorney general, more

17 powerful than the district attorney?  Well, who did all these

18 people have to come to in Luzerne County to accomplish their

19 purposes?  They had to come to the judges.  As to Luzerne

20 County, these were extraordinarily powerful men.  As to PA

21 Child Care, Mark Ciavarella was all powerful because he was the

22 one who decided whether the kids went there or not.  He had the

23 power really of life and death over PA Child Care.

24         And you -- you may recall differently.  I said

25 nothing about a licensing, practice or anything.  Basically I

1  told -- talked about the fact that he held the power over PA

2  Child Care.  The -- the suggestion that there's only -- there's

3  no judicial authority unless he has his robe is completely

4  false.  Judges have official duties.  They have discretionary

5  duties.  But in this case PA Child Care directly affected and

6  impacted upon his official duties as a judge because he was

7  going to be sending kids there and he's getting money back from

8  them in sending kids there.  The owner of it is buying in on a

9  $785,000 condominium down in Florida.  And that doesn't have

10  anything to do with his official duties?  That is laughable.

11  Why July of 2001?

12          MR. FLORA:  Your Honor, I object.  This is way beyond

13  rebuttal.

14          MR. ZUBROD:  It is exactly what his argument was.

15          THE COURT:  Listen, objection is overruled.  Just

16  take that into account.

17          MR. ZUBROD:  Yes, sir, I will.  Let's go on.  Other

18  placement guarantee agreements means the other placement

19  guarantee agreements did the same exact same thing?  They did

20  not do the same thing.  And if you're interested in that, I

21  don't think it hangs one way or the other.  But if you're

22  interested in that, there's significant differences in that.

23  If you compare these agreements with the Luzerne County

24  placement agreement, you will find the other guarantee

25  placement agreements are records of counties and they are

57

1   available for anybody to look at.

2          In Luzerne County this was hidden so nobody could

3   look at it and no one would know about.  It's not only hidden

4   from the county, it's not only hidden from the public, the

5   Luzerne County agreement was hidden from the county

6   commissioners.  The other placement agreement guarantees did

7   not commit funds to pay for the private center.  The Conahan

8   guarantee agreement commits the county to pay $1.3 million over

9   20 years guaranteed.  The president judge has no power to

10  commit county funds, and yet he does it in Luzerne County.

11         You will look at the other ones, and there's no

12  commitment of funds because they know they don't have the

13  authority to do it.  The key difference is the other county

14  placement agreements don't come with million dollar finder

15  fees.  Again, it appears the defense is attempting to deflect

16  attention away from Mr. Ciavarella and his behavior.

17         You have to decide this case based upon the evidence

18  as it points to Mr. Ciavarella, not what is done in other

19  counties which is radically different than what was done in

20  Luzerne County.  The statement about the Ciavarella children

21  and -- they essentially corroborated Powell's testimony that he

22  had a very close relationship with Mr. Conahan.  And I think

23  Mr. Stahl said Powell was friends with Conahan and secondarily

24  with Mr. Ciavarella.  Does it strike -- and the testimony was

25  fairly uniform.

1        Right up until 2005, as I recall the testimony, that

2  these things were going on that the -- that there were

3  relationships.  Do you remember Powell said by 2005 they got

4  another million dollars, I thought I was free, I thought this

5  was all behind me?  And he went out of his way -- it seems to

6  be sucking up to Conahan and Ciavarella trying to get them to

7  leave him alone.  Powell said he was desperate hoping they

8  would leave him alone.  Was this part of the effort to leave

9  him alone?  I don't know.  But I don't think the fact that

10  Robert Powell refused to put down Mr. Ciavarella in front of

11  his children doesn't tip this case one way or the other.  It

12  shows he refused to say something nasty about them to his

13  family.

14        Jill Moran said that in late summer of 2006 there was

15  some violent breach between Conahan and Ciavarella on one side

16  and Powell on the other, it was deep, it was bitter and Powell

17  told her that I'm done with these people, I can't -- I can't

18  deal with them anymore.  Jill Moran had no dog in this fight.

19        The Costa Rica trip -- you remember the boat was

20  moved in 2004 and he was flying down with friends in -- I think

21  it was 2005 or 2006 -- and this was after the million dollar

22  Western PA Child Care fee had been paid.  And really Conahan in

23  an apparent attempt to bury the hatchet, I will pay my own way,

24  can I come down with you.  He said, fine, he came down and

25  Conahan had no contact with him while he was down there.

59

1              The -- the -- I don't know what to do with the

2    statement about Gina Carrelli that -- do you remember that

3    angry young woman that testified Robert Powell took a ride in

4    her fiance's plane?  She was adamant it was her fiance's plane,

5    never mind the fact that Robert Powell testified that her

6    fiance, Robert Marsicano was hired to fly his plane and to run

7    his rental service, 40 Degrees North.  She only got out -- she

8    is the only one who got out to drive out to the plane.  It was

9    in the evening.  It was in the late fall this occurred.  She

10   saw Robert Powell give two letter sized envelope she said

11   filled with cash to a high ranking legislator in the dark at a

12   distance of 20 feet and she had no idea what it was for.

13             And she doesn't discuss it with anybody.  She's a

14   close friend of Theresa Conahan.  She doesn't discuss it with

15   her boyfriend.  She shows up in the middle of trial to tell

16   this story.  Now, in his direct testimony Robert Powell said,

17   yeah, I gave other people cash.  So his testimony is consistent

18   with what Ms. Carrelli is saying.  So this evidence doesn't

19   strike me as contradictory.  But it does strike me as

20   implausible for this reason.  She first said that Powell told

21   her he owned a condo in Jupiter, Florida and told her come

22   down.  When she was pressed on it, said she was present at a

23   conversation between Powell and Barbara Conahan and Cindy

24   Ciavarella.  This was my recollection of it.

25             Your recollection counts.  She said, Powell was

60

1  saying they get the penthouse condo and Powell seemed angry at

2  the time.  He said, I'm the one paying for this condo, not you.

3  Well, my understanding was that was their condominium and they

4  were just renting it.  He's basically saying, I'm one the

5  paying for the condo corroborating the fact he's paying and he

6  doesn't like the fact he has to pay.  What did he mean by that?

7  They are the ones paying the mortgage on the condo, Conahan and

8  Ciavarella.  He's angry and complaining he's the one who is

9  making the payments.

10             THE COURT:  Excuse me.  I would like to interrupt

11  you.

12             MR. ZUBROD:  Yes, sir.

13             THE COURT:  You used your time.

14             MR. ZUBROD:  May I have 60 seconds, sir?

15             THE COURT:  Sure.

16             MR. ZUBROD:  Thank you.  In that same conversation he

17  says -- Ms. Carrelli says, this gentleman, Powell, is going to

18  leave his wife and so he's using Conahan to funnel all of the

19  money through.  Is there anybody so stupid that they would go

20  to two women who are friends with his wife and say, I'm going

21  to leave my wife, I am going to hide the money here?  Also -- I

22  mean you may do that with a guy.  You'd never do with that a

23  woman.  That would be stupid.

24             And finally, the -- the issue of they couldn't -- the

25  defendant could not explain on the stand all of this thing

61

1    about the money, how Robert Powell makes out on this at all.

2    All of the money goes to them.  They are keeping all of the

3    money.  They are paying the thing off.  Ladies and gentlemen,

4    look, let's sum it up this way.  You took an oath when you came

5    in here that you would decide this case basically upon the

6    evidence and upon the -- -- the instructions that you get from

7    Judge Kosik.  And the public has placed its trust in you that

8    if the evidence isn't there you will acquit, but if the

9    evidence is there, the trust has been placed in you that you

10   will convict.  You took that oath.  And today I am holding you

11   to that promise that you base this decision solely upon the

12   evidence you heard, you base this decision solely upon what you

13   hear from Judge Kosik about the law.  And then and only then

14   will justice be done.  Thank you.

15           THE COURT:  Thank you.  Ladies and gentlemen, you're

16   sitting almost an hour.  We will take a brief recess again, and

17   I will start the charge.  And then we will adjourn at noon, and

18   I will complete it after the luncheon break.  So we will break.

19           (A brief recess was taken.)

20           THE COURT:  We will start this charge so we can break

21   for lunch and then come back and conclude the charge and allow

22   the jury to commence deliberation at the earliest possible hour

23   this afternoon.

24           At this point, you have not only heard all the

25   evidence that's going to be presented in this case but, in

1  addition, the closing arguments of counsel, and soon the jury

2  will be called upon to perform its function of arriving at a

3  verdict.  Can you hear me?

4          At this juncture, it's the Court's duty to instruct

5  you as to your function as a jury and tell you how you are to

6  go about it and give you the law that controls in a case such

7  as this.  Everything I do is intended to be a guide to the

8  jury.  The Court's charge is extemporaneous and other parts in

9  the interest of accurately communicating the law will require

10  some reading.  That's the unfortunate part of the Court's

11  charge.

12          Initially, I tell the jury there are four basic

13  sources to which a jury can turn in arriving at a verdict.  The

14  first of these is your general knowledge, which includes your

15  experience in life, your education and, of course, your common

16  sense.  We come from various walks of life, and that's the

17  magic about the jury system.  You have different experiences,

18  and you must draw upon that variety in consideration of the

19  evidence that's been presented in this case.  You have a number

20  of minds reaching a common judgment, and it's not left up to

21  one individual such as a judge to decide what's right and

22  what's wrong.  Next, you're to consider the evidence.

23          By evidence, I mean only that which was produced in

24  this courtroom whether from witnesses, tapes that you heard or

25  stipulations.  There were many stipulations, as you know,

63

1    particularly as to exhibits.

2            Those will be taken out with the jury.  Next, you're

3    to consider the arguments of counsel.  In this case counsel are

4    trained in the law, and they are experienced lawyers.  And they

5    appeared as advocates at the end of the trial as in this case,

6    and they argued from the evidence.  And they have a right to

7    argue from the evidence in order to persuade the jury that

8    their client and their cause should be accepted by the jury in

9    arriving at its verdict.

10           Although they have a right to argue from the evidence

11   and sometimes press opinions, and we caution they were not

12   witnesses in this case and they are simply to rely on facts and

13   their opinions but not evidence in the case, they are entitled

14   to argue from their recollection of the evidence.  And if it

15   conflicts in any way with what the jury recollects occurred,

16   obviously your recollections have to control.  The same would

17   apply to me if I elected to address any evidence in this case,

18   and I don't propose to do that.  It's not that long of a case.

19   Finally, as a source you have the judge's charge.

20           We have a duty to correctly communicate to you the

21   law applicable in a case such as this.  And the Court or jury

22   may not agree with the law that we're dealing with, but it's

23   our duty and your duty to accept the law and to apply it to the

24   facts in this case.  Your primary basic duty of the jury is to

25   determine the truth of the facts in this case.  You're the sole

64

1  judges of the facts and any logical inferences which may be

2  drawn from the facts as you find them to exist.

3         In doing so, a jury has to recall all of the evidence

4  that was presented in the case and give due consideration and

5  decide for themselves that which is important and which is not.

6  And at various times I think I instructed the jury you have to

7  keep an open mind until all the evidence is in before you

8  evaluate it and decide what it is you are going to believe or

9  disbelieve.

10        And in doing so, in determining what the true facts

11 are, you of necessity have to have resolve conflicts in the

12 evidence.  These conflicts may be natural.  All people do not

13 hear or see the same thing, and yet they can be truthful.  On

14 the other hand, some conflicts may be deliberate, but that's

15 your function to decide the truth and the lack of truth in

16 anything that was presented to you.  We tell you as to any

17 evidence -- any witness' testimony that you can accept part,

18 reject part or all of any witness' testimony, or you can accept

19 all of any witness' testimony.

20        It's important you give fair consideration to

21 everything that was presented, and remember that it's your

22 recollection and your recollection alone that must guide your

23 determination in this case.  In every case, there's an issue of

24 credibility and in where witnesses testified the law states

25 that the jurors are to pass upon the credibility or

65

 1  believability of what you have heard presented in the

 2  courtroom.

 3          Accordingly, you are the sole judges of whether a

 4  witness' version of the facts is to be credited.  You say, how

 5  do we determine credibility?  The law says you may consider the

 6  appearance of that individual during the trial, the manner in

 7  which that person has testified and the reasonableness of the

 8  testimony.  All these attest to the general demeanor of the

 9  individual in their appearance in the trial.  You may also

10  mentally inquire as to each witness' testimony whether or not

11  it had the ring of truth.

12          Did the witness have a chance to know or to observe?

13  Was the testimony corroborated by other evidence in the case?

14  Did the witness have an interest in the outcome of the case?

15  And that may be a common occurrence, but it doesn't mean that

16  that person is going to be untruthful.  Did the witness permit

17  their interest in any way to color or to bias their testimony?

18  All of these things fall in the category of common sense and

19  your experiences in life in determining whether someone is

20  being truthful or untruthful.  Where there are differences --

21  and there are in every case -- jurors have a duty to reconcile

22  those differences if you can.  And if you cannot, then you must

23  determine if somebody was being untruthful or just coloring

24  their testimony.

25          The weight to be given to the evidence is your

1  responsibility.  Weight is not related to the number of

2  witnesses on either side where such exists.  Weight of the

3  evidence is based on what the jury decides it is going to

4  believe.  There is a maxim in the law which is almost as old as

5  the law itself.  It says false in one thing, false in

6  everything.  In its application to the trial of a case in a

7  court of justice it means if you find any witness was not

8  completely truthful in testifying, you're at liberty to

9  disregard the whole of that witness' testimony.

10         Testimony of a witness may be discredited or

11  impeached by showing that that person has previously made

12  statements which are inconsistent with what they presented from

13  the witness stand.  And the earlier contradictory statements

14  are admissible only to impeach or reflect on the credibility of

15  the witness unless the previous statements are something that

16  was said under oath at any other time, and then you have a

17  choice to determining whether you want to believe what was

18  previously stated under oath or what was stated under oath

19  during the course of the trial.

20         In this case, as in most cases there are two types of

21  evidence that you may properly consider .  One type of evidence

22  is called direct evidence, and it's where a witness testifies

23  to what they saw, what they heard or observed.  In other words,

24  when the witness testified about what is known to him of his

25  knowledge or her knowledge by virtue of their senses as to what

1  they, see feel, touch or hear, that's called direct evidence.

2  Circumstantial evidence is evidence which tends to prove a

3  disputed fact by proof of other facts.

4       In this case, you heard audio recordings that were

5  received in evidence, and you are given written transcripts of

6  the recordings.  At the time I instructed you how to consider

7  that, and I must reiterate that the transcript themselves are

8  not evidence in the case.  They were given to you only as a

9  guide to help you to follow what was being said.

10      The recording themselves -- recordings themselves are

11  the evidence.  And if you notice any differences between what

12  you heard on the recording and what was in the transcript, you

13  must rely on what you heard and not what you read.  And if you

14  could not hear or understand certain parts of the recordings,

15  you must ignore the transcript if those existed.  In this case

16  we also had some charts and summaries.

17      The charts I don't believe were identified and,

18  therefore, are not in evidence.  But there were summaries

19  testified to and given to you in order to help explain facts

20  disclosed by other records in the case.  Such summaries,

21  however, are not in and of themselves evidence or proof of any

22  facts unless admitted into evidence.  And if such exists and

23  they are not admitted in the evidence, then you cannot consider

24  them.

25      The defendant in this case has taken the witness

68

stand.  Obviously, the defendant has a deep personal interest
as a result of this prosecution.  This interest may create a
motive for false testimony.  In appraising the defendant's
credibility, you may take that into account.  It by no means
follows that certainly because a person has a vital interest in
the end result that that person is not capable of telling a
truthful and straight forward story.  It is for to you to
decide to what extent, if any, the defendant's interest as
affected or colored his testimony.

Ultimately, the defendant's credibility should be
judged by you in the same way as you judge the testimony of any
other witness in this case.  This is a criminal case as you
know.  And in all criminal cases, the defendant comes into
court cloaked with the presumption of innocence.  This
presumption stays with the defendant through all stages of the
trial including your deliberations until such a time after
consideration of all of the evidence, arguments by the lawyers
and the charge of the Court, the jury concludes that the
defendant is guilty beyond a reasonable doubt.

The United States in this case has the burden of
proof.  This burden of proof never shifts to the accused.  A
defendant has no obligation to do anything in the criminal
case.  We reiterate that even though you heard it more than one
time during the history of this trial.  The government is
required to prove this case and each and every element of the

69

1  offense charged beyond a reasonable doubt, and those elements

2  will be described for you unfortunately in a lot of maybe

3  boring detail, but they will be very necessary for you to

4  consider.

5         If that's the burden of the government, it's natural

6  for you to ask them what is a reasonable doubt.  It is a doubt

7  that would cause you or any person to pause and to hesitate in

8  a matter of importance to one regarding one's own affairs.

9  It's not a doubt you conjure up merely to escape the

10 consequences of returning an unpleasant verdict.  It is a doubt

11 which is reasonable, and it's a doubt that's fairly arising out

12 of the evidence.

13        If after a consideration of the charges against the

14 defendant and the elements which are needed to be proved by the

15 government you have such a reasonable doubt as to any material

16 part of the government's case, it is your duty to resolve it in

17 favor of the defendant and to promptly acquit him.  If you have

18 no such doubt, it's your equal duty to convict.  You must

19 remember the government is not required to prove the case

20 beyond all doubt.

21        That would be virtually impossible, and proof is not

22 to be equated with mathematical certainty.  There's an

23 indictment in this case, and it contains quite a few charges.

24 In order to try to communicate these charges to you, I will

25 start out by saying the indictment itself is not evidence.  And

70

1  we told that to you on more than one occasion.  In other words,

2  simply because a grand jury heard evidence -- one-sided

3  evidence presented by the government doesn't mean that a grand

4  jury's indictment is somehow evidence that the defendant is

5  guilty.

6         You might say otherwise, why would he be here when

7  the grand jury returned an indictment.  That's not the case.

8  The standard of proof before the grand jury is entirely

9  different than what you have to consider in determining the

10  guilt of a defendant.  While we have all of these charges in

11  the case, it's your duty to separately consider the evidence

12  that relates to each of those charges, and you must return a

13  separate verdict for each of those offenses.

14         Ladies and gentlemen, getting to those charges at

15  this point -- let me just say that in this indictment we have

16  quite a few charges alleged.  But counts one and count two of

17  the indictment charge the defendant, Mark Ciavarella, with

18  offenses relating to Racketeer Influenced Corrupt Organizations

19  Act.  Counsel sort of touched on that -- government's counsel

20  -- at the end of his closing statement.  This is commonly known

21  to us as RICO Act because it charges -- RICO charges require

22  you to consider elements of a number of offenses that are also

23  charged in other counts of the indictment.

24         As a result, while RICO is charged in the first two

25  counts of this indictment and because it involves several other

71

1  charges within the indictment, I'm going to instruct you first

2  on those offenses that are required to be proved in RICO.

3  Counts three through six of the indictment commence with such

4  offenses, and count three to six charge the defendant, Mark

5  Ciavarella, with wire fraud.

6         Count seven through ten of the indictment charges the

7  defendant with mail fraud.  Both wire fraud and mail fraud are

8  violations of federal law.  In order to find the defendant

9  guilty -- incidentally, as I go through these charges and the

10 elements, I want the jury to remember that when we're finished

11 with this you're going to get this charge that I am reading.

12        You will have the benefit of the indictment, and we

13 noted in the indictment where the various charges commence so

14 you will have no difficulty in finding them.  In order to find

15 the defendant guilty of these offenses, wire fraud and mail

16 fraud, you must find that the government proved three elements

17 beyond a reasonable doubt.  The first two elements are the same

18 for both wire fraud and mail fraud.  The first two elements the

19 government must prove beyond a reasonable doubt for wire fraud

20 and mail fraud are, first, Mark Ciavarella knowingly devised a

21 scheme to defraud the public of its right to the honest

22 services of Mark Ciavarella through bribery or kickbacks and by

23 materially false or fraudulent pretenses, representations or

24 promises wilfully participated in such a scheme with knowledge

25 of his fraudulent nature.

1          Second, that Mark Ciavarella acted with the intent to

2    defraud.  The third element for the offense of wire fraud and

3    mail fraud are different.  For wire fraud the third element the

4    government must prove beyond a reasonable doubt is that in

5    advancing, furthering or carrying out the scheme, Mark

6    Ciavarella transmitted any writing, signal or sound by means of

7    a wire, radio or television communication in interstate

8    commerce or caused the transmission of any signal or sound of

9    some kind by means of wire, radio or television communication

10   in interstate commerce.  That comes from the statute.

11          For mail fraud, the third element the government must

12   prove beyond a reasonable doubt is that in advancing,

13   furthering or carrying out the scheme, the defendant used the

14   mails, a private or commercial interstate carrier or caused the

15   mails or a private or commercial interstate carrier to be used.

16   The first element which are applicable to both, the government

17   must prove beyond a reasonable doubt that Mark Ciavarella

18   knowingly devised or wilfully participated in a scheme to

19   defraud the citizens of Luzerne County, the citizens of the

20   Commonwealth of Pennsylvania or Judiciary of the Commonwealth

21   of Pennsylvania of the tangible right of honest services of

22   Mark Ciavarella through bribes or kickbacks, using materially

23   false or fraudulent pretenses, representations or promises.

24          A scheme is really a plan to accomplish that object.

25   Fraud is a general term which embraces all the various means by

73

1   which a person can gain an advantage over another person by

2   false pretense, suppression of the truth or the deliberate

3   disregard for the truth.  A scheme to defraud is any plan

4   devised or course of action to deprive another of the tangible

5   right of honest services by means of false or fraudulent

6   pretense, representations or promises reasonably calculated to

7   deceive persons of average prudence.  A public official or

8   employee owes a fiduciary duty of honest, faithful and

9   disinterested service to the public and to the government he

10  serves.

11          The public relies on officials of the government to

12  act for the public interest, not for their own enrichment.  A

13  government official who uses his public position for

14  self-enrichment through bribery or kickback, breaches the duty

15  of honest services owed to the public and the government.  So,

16  for instance, a public official who accepts a bribe or kickback

17  breaches the duty of honest, faithful and disinterested service

18  while outwardly appearing to be exercising independent judgment

19  in his official work, a public official instead has been paid

20  privately for his public conduct, thus the public and the

21  government are not receiving honest and faithful services.

22          In Pennsylvania where a person is a government

23  official and has a financial relationship with someone who will

24  benefit from the public employee's official actions, that

25  official has an affirmative duty to disclose information about

74

1    the relationship.  If you find that the defendant engaged in

2    undisclosed bias decision making for personal gain through

3    bribery or kickbacks, that constitutes a deprivation of honest

4    services even if the public suffered no tangible harm.  Active

5    fraud or deceit is not necessary.  The intentional violation of

6    the duty to disclose provides the requisite deceit.

7    Accordingly, if a public official takes a bribe or kickback and

8    intentionally does not disclose the material information

9    regarding a conflict of interest and benefits financially, then

10   that official has deprived the public and the government of the

11   right to honest services.

12          Bribery and kickbacks involve the exchange of a thing

13   or things of value for official action by a public official, in

14   other words a quid pro quo, and you heard that statement means

15   this for that.  Bribery and kickbacks also include offers and

16   solicitations of things of value in exchange for official

17   action.  That is, for the payor, bribery and kickbacks in the

18   offer or agreement to provide a thing of value to a public

19   official in exchange for official action whether or not the

20   public official actually accepted the thing of value or agreed

21   to perform their perform official action.  For the public

22   official, bribery and kickbacks include a public official's

23   solicitation or agreement to accept a thing of value in

24   exchange for official action.

25          Whether or not the payor actually provided the thing

75

of value and whether or not the public official ultimately performed the requested official action, the public official and the payor need not state the quid pro quo in express terms for otherwise the law's effect could be frustrated by knowing winks and nods.  Rather, the intent to exchange may be established by circumstantial evidence based on the defendant's words, conducts and acts.

Bribery and kickbacks require the intent to effect an exchange of money or other thing of value for official action, but each payment need not be correlated with a specific official act.  The requirement that there be payment of a thing of value in return for the performance of an official act is satisfied so long as the evidence shows a course of conduct of things of value flowing to a public official in exchange for a pattern of official action favorable to the donor.

In other words, the intended exchange in bribery can be this for this or these for those or this for that.  Further, it's not necessary for the government to prove that the defendant intended to perform a set number of official acts in return for the payments.  All that must be shown is the payments were made with the intent of securing a specific type of official action in return.  For example, payments may be made with the intent to retain the official's services as a needed base -- on a needed basis that whenever the opportunity presents itself the public official would take specific action

1  on the giver's behalf.  It is not a defense to claim that the

2  public official would have lawfully performed the official

3  action in question even without having accepted the thing of

4  value.

5            In other words, it's not a defense that the offer or

6  promise of anything of value was made to the public official in

7  exchange for an official action that is actually lawful,

8  desirable or even beneficial to the public.  The offense of

9  honest services fraud is not concerned with the wisdom or

10  results of the public official's decisions but rather with the

11  manner in which the public official makes his or her decisions.

12            What the government must prove is the defendant

13  knowingly devised or participated in a scheme or artifice to

14  defraud the public and the government of the right to a public

15  official's honest services through kickbacks or bribes.  Also

16  because people rarely for a single purpose, the giver need not

17  have offered or provided the thing of value only in exchange

18  for specific official actions, and the public official need not

19  have solicited or accepted the thing of value only in exchange

20  for the performance of official action.

21            If you find beyond a reasonable doubt that the giver

22  offered or provided a thing of value in exchange for the

23  performance of official action, then it makes no difference

24  that the giver may also have another lawful motive for

25  providing a thing of value.  Likewise, if you find beyond a

77

1  reasonable doubt that the public official solicited or received

2  a thing of value in exchange for a form of official action,

3  then it makes no difference that that official may also have

4  had another lawful motive for soliciting or accept the thing of

5  value.  The term official act includes any act within the range

6  of the official's duty of a public official and any decision,

7  recommendation or actions on any question, matter, cause,

8  proceeding or controversy which at any time may be pending or

9  which may by law be brought before any public official in such

10 public official's capacity.

11        Official acts include decisions or actions generally

12 expected of the public official.  In addition, official action

13 includes the exercise of both formal official influence such as

14 a judge's performance and duties in court proceedings and

15 informal official influence such as the

16 judge's behind-the-scenes influence on the other judges or

17 employees of the judiciary.

18        Official action also includes a public official's

19 altering his or her official acts, changing the position which

20 he or she would otherwise have taken or taking action in his or

21 her official capacity that he or she would not have taken but

22 for the scheme.  Anything of value includes things possessing

23 intrinsic value whether tangible or intangible that the person

24 giving or offering or the person soliciting or receiving

25 considers to be worth something.  This includes sums of money.

78

1          In this case, the indictment alleges that the scheme

2     to defraud was carried out by making false or fraudulent

3     statements, representations, claims or documentation.  The

4     representation which the government charges were made as part

5     of a scheme to defraud are set forth in the indictment.  The

6     government is not required to prove every misrepresentation

7     charged in the indictment.

8          It is sufficient if the government proved beyond a

9     reasonable doubt that one or more of the alleged material

10    representations was made in furtherance of the alleged scheme

11    to defraud.  However, you cannot convict a defendant unless all

12    of you agree at least one of those material representations.

13         A statement, representation, claim or document is

14    false if it is untrue when made and if the person making the

15    statement, representation, claim or document or causing to be

16    made knew it was untrue at the time.  A representation or

17    statement is fraudulent if it was falsely made with the

18    intention to deceive.

19         In addition, deceitful statement or half truths or

20    the concealment of material facts or the expression of an

21    opinion not honestly entertained may constitute false or

22    fraudulent statements.  The arrangement of the words or the

23    circumstances in which they are used may convey false and

24    deceptive appearance.  The deception need not be premised upon

25    spoken or written words alone.

79

1              If there is deception, the manner in which it is

2    accomplished is immaterial.  The deceit may consist of the

3    concealment of things of value that the public official has

4    solicited or received or the public official's implicit false

5    pretense to his governmental employer that he remains loyal to

6    his employer's interest.  The failure to disclose information

7    may constitute a fraudulent representation if the defendant was

8    under a legal, professional or contractual duty to make such a

9    disclosure, and the defendant actually knew such a disclosure

10   ought to be made and the defendant failed to make it.

11             The false or fraudulent representation or a failure

12   to disclose must relate to a material fact or matter.  A

13   material fact or matter is one which would reasonably be

14   expected to be of concern to a reasonable and prudent person in

15   relying upon the representations or statements in making an

16   assessment as to whether or not the public official was, in

17   fact, providing honest services to the citizens and the

18   judiciary.

19             This means that if you find that a particular

20   statement of fact was false, you must determine whether that

21   statement was one that a reasonable person might have

22   considered important in making his or her assessment.  The same

23   principle applies to fraudulent half truths or omissions of

24   material facts.

25             In order to establish a scheme to defraud, the

80

1  government must also prove that the alleged scheme contemplated

2  depriving another of the intangible right of honest services.

3  However, the government is not required to prove Mark

4  Ciavarella himself originated the scheme to defraud.

5  Furthermore, it's not necessary that the government prove that

6  Mark Ciavarella actually realized any gain from the scheme or

7  that any intended victim was actually defrauded of the right to

8  honest services of Mark Ciavarella.

9          In this case, it so happens that the government does

10  contend that the proof establishes that citizens and the

11  judiciary were defrauded of the right to honest services of

12  Mark Ciavarella and that he profited.  Although whether or not

13  the scheme actually succeeded is really not the question.  You

14  may consider whether it succeeded in determining whether the

15  scheme existed.  So if you find beyond a reasonable doubt that

16  Mark Ciavarella alone or with the help of others devised or

17  wilfully participated in the scheme to defraud the citizens of

18  Luzerne County or the Commonwealth of Pennsylvania or the

19  judiciary of this Commonwealth of the tangible right to honest

20  services through bribes or kickbacks and by materially false or

21  fraudulent pretenses, representations or promises as defined

22  here, then you may find the first element to exist.

23          The second element that the government must prove

24  beyond a reasonable doubt is that Mark Ciavarella acted with

25  specific intent to defraud, and to act with intent to defraud

81

1  means acted knowingly and with the intention or purpose to

2  deceive or to cheat.  In considering whether Mr. Ciavarella

3  acted with an intent to defraud, you may consider, among other

4  things, whether he acted with a desire or purpose to bring

5  about some gain or benefit to himself or someone else or with a

6  desire or purpose to deny the public or the government of its

7  right to honest services.

8          Wire fraud, the other offense.  The third element to

9  show or -- that's required to show wire fraud, that the

10  government must prove beyond a reasonable doubt for wire fraud

11  is that in advancing, furthering or carrying out the scheme,

12  Ciavarella transmitted a writing, signal or sound by means of

13  wire, radio or television communication in interstate commerce

14  or caused the transmission of any writing, signal or sound by

15  some means of wire, radio or television communication in

16  interstate commerce.

17          The phrase transmits by means of wire, radio or

18  television communication means to send from one state to

19  another by means of telephone or telegraph lines or by means of

20  radio or television.  The government is not required to prove

21  Mark Ciavarella actually used the wire communications in

22  interstate commerce or that Mark Ciavarella even intended that

23  anything be transmitted in interstate commerce by such a means.

24          However, the government must prove beyond a

25  reasonable doubt that a transmission by wire, radio or

82

1  television communication facility in interstate commerce was,

2  in fact, used in some manner to further or to advance or carry

3  out the scheme to defraud.  The government must also prove

4  either that Mark Ciavarella used wire, radio or television

5  communication in interstate commerce or that he knew the use of

6  such would follow in the ordinary course of business.  It's not

7  necessary that the information transmitted by wire, radio or

8  television communication in interstate commerce itself was

9  false or fraudulent or contained any false or fraudulent

10 pretense, representation or promise or contained any request

11 for money or thing of value.

12        However, the government must prove beyond a

13 reasonable doubt that the use of that facility in interstate

14 commerce furthered or advanced or carried out the scheme.  Each

15 transmission of wire communication in interstate commerce to

16 advance or further or carry out the scheme or plan may be a

17 violation of the wire fraud statute.  The next offense, ladies

18 and gentlemen, is in counts seven through ten dealing with mail

19 fraud.

20        The third element that is dealing with mail fraud

21 that the government must prove beyond a reasonable doubt for

22 mail fraud is that in advancing, furthering or carrying out the

23 scheme Ciavarella used the mails or private commercial

24 interstate carrier or caused the mails of a private or

25 commercial interstate carrier to be used.  The government is

83

1  not required to prove that Mark Ciavarella himself actually

2  mailed anything or that he even intended that the mails would

3  be used to further or advance or to carry out the scheme.

4          However, the government must prove beyond a

5  reasonable doubt that the mails or private or commercial

6  interstate carrier were, in fact, used in some manner or to

7  advance or to carry out the scheme to defraud.  The government

8  must also prove either that Mark Ciavarella used the mails or

9  that he knew the use of mails or private or commercial

10 interstate carrier would follow in ordinary course of business

11 or events.

12         The government must prove beyond a reasonable doubt

13 that the use of the mails or private or commercial interstate

14 carrier in some way furthered or advanced or carried out the

15 scheme.  Each use of the mails to advance or to further or

16 carry out the scheme or plan may be a separate violation of the

17 mail fraud statute.

18         Now, with respect to the counts that I have just

19 addressed, I must tell the jury that if you do not find that

20 the government proved beyond a reasonable doubt that a bribe or

21 a kickback was paid in connection with the alleged wire fraud

22 and mail fraud counts, you must find Mark Ciavarella not guilty

23 of those offenses.  We are going into the other counts from 11

24 to 20 when we get back from lunch.  So we will you see back

25 here at 1:00.

84

1          (A lunch recess was taken.)

2          THE COURT:  Please sit down.  Starting after this

3    afternoon, the next instruction deals with counts 11 through

4    20.  This morning we had a block of counts as well, and the

5    reason we had -- the instructions I gave you now are counts for

6    11 to 20 because as you will see when you examine the

7    indictment if you wish -- but I want to give you an example.

8    Eleven through 20 counts charging corrupt receipt of bribe or

9    reward -- and we will give you the instructions that apply to

10   each of those counts.

11         But I want to bring to your attention that the count

12   11 to 20 has the same charge, and in there it shows count 11

13   for payment from Vision Holdings, count 12, payment from Vision

14   Holdings, all of the way to count 20 of payment from Robert

15   Powell and in between the same thing.  But the count numbers

16   are in the indictment, and they apply to different payments.

17   So what I am about to tell you applies from each of the counts

18   11 to 20, but the counts are different, as you will see in the

19   indictment, as to the amount in payment, okay.

20         Now, count 11 through 20 of the indictment charges

21   the defendant, Mark Ciavarella, with corrupt receipt of bribes

22   or rewards for official action concerning programs receiving

23   federal funds, which is a violation of federal law.  And in

24   order to find the defendant guilty of this offense as to any of

25   the counts from 11 to 20, the elements that must be proved

1  beyond a reasonable doubt are first, that at the time of the --

2  as alleged in the indictment for each count, Mark Ciavarella

3  was an agent of the Commonwealth of Pennsylvania or Luzerne

4  County or the Luzerne County Court of Common Pleas or the

5  Administrative Office of Pennsylvania Courts.  Second, that the

6  Commonwealth of Pennsylvania, Luzerne County or Court of Common

7  Pleas or the Administrative Office received federal funds in

8  excess of $10,000 in a one-year period.  Third, that Mark

9  Ciavarella accepted, agreed to accept, solicited or demanded

10  something of value from Robert Powell or Robert Mericle.

11  Fourth, that Mark Ciavarella acted corruptly with the intent to

12  be influenced or rewarded in connection with the official

13  action taken and intended to be taken by him in his capacity as

14  a judge of the Court of Common Pleas, and, five, that the value

15  of the business, transactions or a series of transactions to

16  which payment related was at least $5,000.

17          First element -- the first element the government

18  must prove beyond a reasonable doubt is that at the time

19  alleged in the indictment Mark Ciavarella was an agent of the

20  Commonwealth of Pennsylvania or Luzerne County for the Court of

21  Common Pleas or the Administrative Office of the Pennsylvania

22  Courts.  The answer to that is elected officials are agents of

23  the government which they were elected to serve.  The second

24  element the government must prove beyond a reasonable doubt is

25  that in a one-year period the Commonwealth of Pennsylvania or

86

1   Luzerne County or those other agencies, the Administrative

2   Office of the Pennsylvania Courts received federal benefits in

3   excess of $10,000.

4           To prove this element, the government must establish

5   that the Commonwealth and those other agencies received within

6   a one-year period of each date alleged in counts 11 to 20 of

7   the indictment benefits in excess of $10,000 under a federal

8   program involving a grant, contract, subsidy, loan, guarantee,

9   insurance or some other form of federal assistance.  Third --

10  the third element the government must prove beyond a reasonable

11  doubt is that Mark Ciavarella accepted, agreed to accept,

12  solicited, demanded something of value from Robert Powell or

13  Robert Mericle.

14          In this case, the United States alleges that Mark

15  Ciavarella accepted, agreed to accept, solicited or demanded

16  the payment of money.  The government is not required to prove

17  that the thing of value that the defendant allegedly illegally

18  accepted, agreed to accept, solicited or demanded was federal

19  benefits or that the illegal acts directly affected the federal

20  benefits that the entity received.  Rather, the government is

21  required to prove only the defendant illegally accepted --

22  agreed to accept, solicited or demanded a thing of value while

23  he was an agent of the entity which itself received $10,000 as

24  a federal benefit.

25          Fourth element, must prove beyond a reasonable doubt

87

1   Mark Ciavarella accepted, agreed to accept, solicited or

2   demanded something of value corruptly and with the intent to be

3   influenced or rewarded in connection with some business or

4   transaction of the Commonwealth of Pennsylvania, Luzerne County

5   Court of Common Pleas or the Administrative Office of the

6   Pennsylvania Courts.  To act corruptly means simply to act

7   knowingly and intentionally with the purpose either of

8   accomplishing an unlawful end or an unlawful result or of

9   accomplishing some otherwise lawful end or lawful result

10  influenced by the receipt of the thing of value.

11          Corrupt acts are ordinarily motivated by hope or

12  expectation of either financial gain or other benefits to one's

13  self.  In considering this element, remember that the

14  government must prove that the defendant intended at least in

15  part to be influenced or rewarded, but the government is not

16  required to prove that those agencies or the administrative

17  office took any particular action.

18          Also if you find the defendant accepted the payment

19  with the intent to be rewarded for a decision already made, it

20  does not matter that the payment was not accepted or solicited

21  until after the transaction occurred.  The fifth element.  The

22  government must prove beyond a reasonable doubt is that the

23  value of the official actions to which the payment related was

24  at least $5,000.

25          To establish this element, the government must prove

88

1   that Mark Ciavarella intended to be influenced or rewarded in

2   connection with any business or transactions or a series of

3   transactions of those agencies I have alluded to involving

4   anything of value of $5,000 or more.  If you find that the

5   business, transaction or series of transactions in question

6   have a value of at least five thousand, this element is

7   satisfied.  The government is not required to prove that Mark

8   Ciavarella received at least five thousand.  It is the value of

9   the business transaction or a series of transactions that the

10  bribe or reward was intended to influence or reward that is

11  important for the purposes of element.

12          Now, next we have counts 22 to 26 which indicate we

13  are making progress.  These counts deal with the crime of money

14  laundering.  Counsel have addressed that.  Count 22 through 26

15  of the indictment charges Mark Ciavarella with money

16  laundering, which is a federal crime.  In order to find him

17  guilty of this offense, you must find that the government

18  proved each of the following elements beyond a reasonable

19  doubt.

20          First, that on or about the dates alleged in the

21  indictment and thereto these instructions apply to each one of

22  those counts, and those counts will deal with a different

23  amount or subject.  In order to find him guilty of this

24  offense, you must find the government proved each of the

25  following elements beyond a reasonable doubt, that on the date

89

1  or dates alleged in the indictment Mark Ciavarella conducted or

2  attempted to conduct a financial transaction which affected

3  interstate commerce.  Second, Mark Ciavarella conducted a

4  financial transaction with the proceeds of a specified unlawful

5  activity as alleged in the count of the indictment.  That is

6  honest services, wire fraud or bribery concerning programs

7  receiving federal funds or extortion under the color of

8  official right in violation of the statutes.  Third, that Mark

9  Ciavarella knew the transaction involved the proceeds of some

10  form of unlawful activity, and, fourth, that he conducted the

11  financial transaction with knowledge that the transaction was

12  designed in whole or in part to conceal or disguise the nature,

13  location, source, ownership or control of the proceeds in

14  violation of the respective statutes.

15         Money laundering.  The first element of money

16  laundering the government must prove beyond a reasonable doubt

17  is that he conducted or attempted to conduct a financial

18  transaction.  The term conducts includes initiating, concluding

19  or participating in or concluding a transaction.  The term

20  transaction means to purchase, sale, loan, pledge, gift,

21  transfer, delivery or other disposition of property with

22  respect to a financial institution.  The term transaction means

23  a deposit, withdrawal, transfer between accounts or any other

24  payment transfer or delivery by, through or to a financial

25  institution by whatever means effected.

90

1          And the term financial transaction means any

2    transaction that I've just explained that term which in any way

3    or degree affects interstate commerce and involves a movement

4    of funds by wire or other means and involves one or more

5    monetary instrument or involves the use of financial

6    institutions which is engaged in or the activities of which

7    affect interstate or foreign commerce in any way or degree.

8          Now, the term interstate commerce as used in these

9    instructions means commerce between any combination of states,

10    territories or possession of the United States including the

11    District of Columbia.  The government is not required to prove

12    only that the financial institutions or banks through which

13    financial transactions were conducted were engaged in or had

14    other activities which affected interstate commerce in any way

15    or degree.

16          It's not required to prove that the defendant knew of

17    or intended the effect on interstate commerce, merely that such

18    an effect occurred.  The term proceeds means any property or

19    any interest in property that someone acquires or retains as a

20    result of criminal activity.  Proceeds may be derived from an

21    already completed offense or from a completed phase of an

22    ongoing offense such as honest services, wire fraud or bribery

23    concerning programs affecting federal funds or extortion under

24    color of official right or bribery chargeable under state law.

25          I instruct you as a matter of law that the term

91

specified unlawful activity includes honest services wire fraud
in violation of the statutes.  It includes bribery concerning
programs receiving federal funds, extortion under the color of
official right, bribery chargeable under the laws in violation
of the state law.  I already explained the elements on the
honest services wire fraud.  I've also explained the elements
of bribery concerning programs receiving federal funds in
violation of the statute, and I will explain the elements of
extorsion under color of official right in violation of another
provision of the criminal law as well as bribery chargeable
under state law.

The third element that the government must prove
beyond a reasonable doubt is that in conducting a financial
transaction Mark Ciavarella knew that the property involved in
the transaction represented the proceeds of some form of
unlawful activity.  To satisfy this element, the government
must prove that Mr. Ciavarella knew the property involved in a
transaction represented proceeds of some form of unlawful
activity and this is a felony offense under state, federal or
foreign law.  The government is not required to prove that
Ciavarella knew what the unlawful activity was.

In this case, the government claims that Mr.
Ciavarella knew that the proceeds were derived from unlawful
activity which constitutes honest services wire fraud, bribery
concerning programs receiving federal funds or extortion under

92

1  color of official right, which are all felonies under federal

2  law.

3           The final element that the government must prove

4  beyond a reasonable doubt is that Mr. Ciavarella is -- in

5  conducting the financial transaction intended to conceal or

6  disguise the nature, source, ownership or the control of the

7  proceeds of the specified unlawful activity, that is honest

8  services, wire fraud, bribery concerning programs, federal

9  funds or extortion under color of official right may be

10 established by proof of Mark Ciavarella's actual knowledge by

11 circumstantial evidence or by the defendant's wilful blindness

12 were or purposeful ignorance.  In other words, you're entitled

13 to find from the circumstances surrounding the financial

14 transactions or attempted financial transaction the purpose of

15 that activity and Mr. Ciavarella's knowledge.

16          If I emphasize a word or phrase, I don't mean

17 anything by the emphasis regarding the parties.  I mean the

18 emphasis to mean that it's important to the charge.  All right.

19 We have a money laundering conspiracy.  I just instructed you

20 on what money laundering was.  We also have a money laundering

21 conspiracy.

22          The United States Criminal Code makes it a crime for

23 anyone to conspire with someone to commit a money laundering

24 offense.  Count 21 charges Mark Ciavarella with being a part of

25 a conspiracy with two separate money laundering objectives.  It

93

1  charges him with first conspiring to engage in financial

2  transactions and property that represented the proceeds that

3  was from unlawful specified activity which affected interstate

4  commerce with the intent to conceal or disguise the nature,

5  location, source or ownership and control of the specified

6  unlawful activity in violation of the criminal code.

7          That count also charged that Mark Ciavarella was

8  conspiring to engage and attempt to engage in monetary

9  transactions in criminally derived property that was of a value

10 greater $10,000 and which was derived from specified unlawful

11 activity.  For you to find the defendant guilty of the crime of

12 money laundering conspiracy, you must be convinced that the

13 government has proven each of the following two elements:  That

14 the conspiracy, agreement or understanding to commit money

15 laundering he violated -- existed in violation of the code

16 prohibiting such conduct.

17         Second, that at some time during the existence or

18 life of the conspiracy, agreement or understanding the

19 defendant knew the purpose of the agreement and then

20 deliberately joined that conspiracy.  Later on I will be

21 conducting or instructing you on the elements of conspiracy.

22 Rather than keep repeating them where conspiracy is involved we

23 will delay and for you to pick up those principles at that

24 time.

25         In my instruction counts 22 to 26, I have reviewed

94

1  the elements of the crime, which is the offense charged as the

2  first objective of the money laundering conspiracy alleged in

3  count 21.  To aid you in your consideration of count 21, I will

4  now instruct you on the elements of that count of conspiracy.

5         A defendant can be found guilty of a violation of

6  Title 18 USC -- these charges were in 22 to 26 -- only if all

7  the following elements are proved beyond a reasonable doubt.

8  First, that the defendant knowingly engaged in or attempted to

9  engage in monetary transactions, that he knew the transaction

10  involved property or funds that were the proceeds of some

11  criminal activity and that the property has a value of more

12  than $10,000, that the property was, in fact, proceeds of wire

13  fraud and extorsion as alleged in the indictment and that the

14  transaction took place in the United States.

15         The term monetary transaction means the deposit,

16  withdrawal, transfer or exchange of funds or monetary

17  instrument by, through or to a financial institution in a way

18  that affects interstate commerce.  The term financial

19  institution includes an insured bank, FDIC, commercial bank or

20  trust company, a private bank or any credit union or thrift

21  institution and issuer, redeemer, cashier of travelers, checks

22  money orders or similar instruments.  You notice in a lot of

23  these counts there's a reference to interstate commerce.

24  That's what makes it a federal law.

25         The same charges could exist in a criminal statute on

95

1 the state, but then this Court wouldn't have jurisdiction.

2 These are laws passed by Congress of the United States, and

3 Congress of the United States has jurisdiction to make those

4 things a crime if they involve interstate commerce.

5          As I mentioned to you a moment ago, the offense of

6 money laundering conspiracy, which is charged in count 21

7 alleges Mark Ciavarella conspired to commit two distinct money

8 laundering offense.  It is not necessary, however, the

9 government prove he conspired to achieve both objectives of the

10 conspiracy.  The government satisfies its burden beyond a

11 reasonable doubt if Mark Ciavarella conspired to commit either

12 of the alleged objectives of the conspiracy.

13          However, you must be unanimous in agreeing to which

14 objective or objectives you find to be proven beyond a

15 reasonable doubt.  Next we have counts 27 to 34.  And thereto,

16 these instructions would apply to each of those counts, and

17 they will -- as you will see if you examine each separate count

18 27 to 34, each separate count will show what the difference was

19 from the one before.

20          In order to sustain a burden of proof for the crime

21 interfering with interstate commerce by extorsion under color

22 of official right as charged in these counts, 27 to 34, the

23 government must prove the following three elements beyond a

24 reasonable doubt:  First, that the defendant, Mark Ciavarella,

25 took from Robert Powell or Vision Holdings property described

96

in counts 27 through 34.  Second, Mark Ciavarella did so

knowingly and wilfully by extortion under color of official

right.  Third, that as a result of Mark Ciavarella's actions,

interstate commerce or an item moving in interstate commerce

was obstructed, delayed or affected.

The term property includes money and any other

tangible or intangible thing of value.  The government alleges

that Mark Ciavarella committed extortion under color of

official right.  A public official such as a judge commits

extortion under color of official right if he uses that power

and authority of his office in order to obtain money, property

or something of value from another to which neither that public

official nor the government office has any official right.

Extorsion under color of official right means that a

public official induced, obtained, accepted or agreed to accept

a payment to which he or she was not entitled knowing that the

payment was made in return for taking, withholding or

influencing an official act.  The government may show that the

benefit was meant to be given to the public official directly

or through a third party who is not a public official but who

was acting in concert with the public official.

The government is not required to prove an explicit

promise to perform the official acts in return for the payment.

Passive acceptance of a benefit by a public official is a

sufficient basis for this type of extortion if the official

97

1  knows that he's being offered payment in exchange for his

2  ability to do official acts.

3        The government is not required to prove Mark

4  Ciavarella made any specific threats or used force or fear to

5  cause Robert Powell or Vision Holdings to part of the property

6  that the indictment alleges Mr. Ciavarella obtained by

7  extorsion under color of right.

8        However, the government must prove beyond a

9  reasonable doubt that Mr. Ciavarella knowingly and deliberately

10  used his official position in order to obtain something of

11  value to which Mark Ciavarella had no right.

12        You will notice every time we are talking about any

13  crime and the elements of every crime, knowing and wilfully,

14  those words are interchanged.  That's what makes something

15  criminal as opposed to an innocent mistake or even a negligent

16  act which is not a crime.  The government is not required to

17  prove that Mark Ciavarella actually possessed the official

18  power to guarantee, deny or influence any action.

19        It's enough to show that Robert Powell or Vision

20  Holdings reasonably believed that Mark Ciavarella had actual

21  residual or anticipated official power to help with respect to

22  matters pending before a government agency.  In order for Mr.

23  Ciavarella to obtain property of another, there must have been

24  a transfer, possession or a legal interest in that property

25  from the other person to Mr. Ciavarella or a designee of Mr.

98

1 Ciavarella.

2        The government must prove beyond a reasonable doubt

3 Mark Ciavarella's conduct affected or could have affected

4 interstate commerce.  Conduct affects interstate commerce if it

5 in any way interferes with, changes or alters the movement or

6 transportation or a flow of goods, merchandise, money or other

7 property in commerce between or among the states.  The effect

8 can be minimal.

9        All that is necessary to prove this element is that

10 the natural consequences of the offense potentially caused an

11 effect on interstate commerce to any degree however minimal or

12 slight.  Count 35.  I believe we only have several more to go

13 but quite a bit more to read.  Count 35 of the indictment

14 charges that from on or about January 1st, 2002, to on or about

15 May 21, 2007 in the Middle District of Pennsylvania and

16 elsewhere that Mark Ciavarella agreed or conspired with Michael

17 Conahan and other persons known or unknown to the grand jury to

18 defraud the United States and that to further the objective of

19 the conspiracy one member of that conspiracy committed at least

20 one overt act as alleged in the indictment.

21        This is a general count of conspiracy against the

22 United States.  In the indictment, it will state that there was

23 intentional conspiracy between these individuals, and I'm going

24 to give you their elements.  But in a general conspiracy such

25 as this, this count -- general conspiracy, count 35, one of the

99

1  elements different from any other conspiracy that I have

2  alluded to is that there must have been an overt act.  If you

3  look in the indictment for count 35 in addition to the charges,

4  they will then list a series of overt acts.  It's important for

5  you to remember that for what I am going to tell you next.

6         It's a federal crime for two or more persons to

7  conspire or agree to defraud the United States or any of its

8  agencies even if they never actually achieve their objective.

9  A conspiracy is a kind of a criminal partnership.  In order for

10 you to find Mark Ciavarella guilty of conspiracy to defraud the

11 United States, you must find the government proved the

12 following four elements, first, that two or more persons agreed

13 to defraud the United States as charged in the indictment.

14        To defraud United States means cheat the government

15 or any of its agencies out of money or property.  It also means

16 to obstruct or interfere with one of the United States

17 Government lawful functions by deceit, craft, trickery or

18 dishonest means.  Second, that Mark Ciavarella was a party to

19 or a member of the conspiracy.  Third, that Mark Ciavarella

20 joined the agreement or conspiracy knowing of its objective to

21 defraud the United States and intending to join together with

22 at least one other conspirator to achieve that objective, that

23 is that Mark Ciavarella and at least one other conspirator

24 shared a unity of purpose with the intent to achieve a common

25 goal to defraud the United States.

1          Fourth, that at some time during the existence of the

2    agreement or conspiracy at least one of its members performed

3    an overt act in order to further the objective of the

4    conspiracy.  That latter element is important.  One of those

5    overt acts that are charged has to -- at least one of them has

6    to be proved.  The existence of an agreement.  I'm going to

7    have to read this to you.  What I want to tell you as I often

8    do in a criminal case in trying to describe a conspiracy it's

9    nothing but an agreement.  It can be formal or informal.  It

10   doesn't have to include words.

11         By way of illustration I will say you can have ten

12   people standing on a corner and there is going to be a

13   discussion in that group to do something unlawful because a

14   conspiracy is an agreement to do something unlawful.  You can

15   be standing there.  But because you're standing there doesn't

16   make you a conspirator.  You're not a conspirator unless while

17   you're standing there you participate and agree with the others

18   to join with them one way or another to accomplish the end that

19   they are talking about, and that's what's important.  The

20   government has to prove the defendant's connection to a

21   conspiracy.

22         That was a simplified explanation.  If the first

23   element of the crime of conspiracy exists, the government must

24   prove beyond a reasonable doubt that two or more persons

25   knowingly and intentionally arrived at a mutual understanding

101

1   or agreement, either spoken or unspoken, to work together to

2   achieve the overall objectives of the conspiracy to defraud.

3   The government does not have to prove the existence of a formal

4   or written agreement or an express oral agreement spelling out

5   the details of the understanding.  The government also does not

6   have to prove that all the members of the conspiracy directly

7   met or discussed between themselves their unlawful objective or

8   agreed to all the details or agreed to what the means were by

9   which the objective would be accomplished.

10          The government isn't even required to prove that all

11  the people named in the indictment were, in fact, parties to

12  the agreement or that all members of the conspiracy were named

13  or that all members of the conspiracy are even known.  What the

14  government must prove beyond a reasonable doubt is that two or

15  more persons in some way or manner arrived at some form of

16  agreement, mutual understanding or meeting of the minds to try

17  to accomplish a common and unlawful objective.

18          To that end, you may consider both direct evidence

19  and circumstantial evidence in deciding whether the government

20  has proved beyond a reasonable doubt that an agreement or

21  mutual understanding existed.  If you find under the charge of

22  general conspiracy to defraud a criminal agreement or

23  conspiracy existed, then in order to find Mark Ciavarella

24  guilty of conspiracy, you must also find that the government

25  proved beyond a reasonable doubt that he knowingly and

102

1    intentionally joined that agreement or conspiracy during its

2    existence.

3             The government must prove that Mark Ciavarella knew

4    the goal or objective of the agreement of conspiracy and

5    voluntarily joined it during the existence intending to achieve

6    a common goal or objective and to work together with the other

7    alleged conspirators toward the goal's objective.  You may

8    consider both direct evidence and circumstantial evidence to

9    decide whether Mark Ciavarella joined a conspiracy, knew of its

10   criminal objective and intended to further the objective.

11            Evidence would show that Mark Ciavarella only knew

12   about the conspiracy or only kept bad company by associating

13   with the members of the conspiracy or was only present when it

14   was discussed or when a crime was committed is not sufficient

15   to prove Mr. Ciavarella was a member of the conspiracy even if

16   he approved of what was happening or did not object to it.

17            Likewise, evidence showing that Mark Ciavarella may

18   have done something that happened to help a conspiracy doesn't

19   necessarily prove that he joined the conspiracy.  You may,

20   however, consider this evidence with all the other evidence in

21   deciding whether the government proved beyond a reasonable

22   doubt that he joined the conspiracy.

23            Now, in order to find Mark Ciavarella guilty of

24   conspiracy, you must find that the government proved beyond a

25   reasonable doubt that he joined the conspiracy knowing of its

1   objective and intending to help further or achieve that

2   objective.  In other words, the government must prove that he

3   knew the objective or goal of the conspiracy, that he joined

4   the conspiracy and that -- at least one -- that he and at least

5   one other person alleged conspirators shared a unity of purpose

6   of the objective or goal.  With regard to the fourth element of

7   conspiracy overt acts -- being a bit repetitious -- the

8   government must prove beyond a reasonable doubt that during the

9   existence of the conspiracy at least one member of the

10  conspiracy performed at least one of the overt acts described

11  in the indictment.

12          I told you you can go to that count at the end.  It

13  says overt acts, and you can see them all listed there.  The

14  indictment alleges certain overt acts.  The government doesn't

15  have to prove all of these acts were committed or that any of

16  these acts were themselves illegal.  The government does not

17  have to prove Mark Ciavarella personally committed any of the

18  acts, but the government must prove beyond a reasonable doubt

19  that at least one member of the conspiracy committed at least

20  one of the overt acts alleged in the indictment and committed

21  it during the time that the conspiracy existed for the purpose

22  of furthering or helping to achieve the objective of the

23  conspiracy.  You must unanimously agree on the overt act that

24  you agree to.  You will have a choice, 15, whatever is alleged

25  in the indictment.

104

1              Now, the government is not required to prove that any

2    of the members of the conspiracy were successful in achieving

3    any or all of the objectives of the conspiracy.  You may find

4    Mr. Ciavarella guilty of conspiracy if you find that the

5    government proved beyond a reasonable doubt the elements I've

6    explained to you even if you find that the government did not

7    prove any of the conspirators actually defrauded the United

8    States.

9              Conspiracy is a criminal offense separate from the

10   offense that was the objective of the conspiracy.  Conspiracy

11   is complete without the of commission that offense.  A

12   conspiracy ends -- remember everything has to be done during

13   the period of a conspiracy.  But a conspiracy ends when the

14   objectives of the conspiracy have been achieved and when all

15   members of the conspiracy have withdrawn.  However, a

16   conspiracy may be continuing.  And if it is, it lasts until

17   there's some affirmative showing that it has ended or all

18   members have withdrawn.

19              Next in conspiracy -- and this has been argued to you

20   and I think explained, but it needs to be repeated.  Evidence

21   in this case -- there was some objections made, and the

22   government responded that part of the conspiracy, oh, yes, it's

23   conspiracy, it's allowed, it came from a coconspirator.

24   Evidence has been admitted in this case that certain persons

25   who are alleged to be coconspirators, Mr. Ciavarella, did or

1  said some different things.  Acts or statements of any member

2  of a conspiracy are treated as the acts or statements of all

3  the members of the conspiracy if these acts or statements are

4  performed or spoken during the existence of the conspiracy and

5  to further its objectives.  Therefore, you may consider

6  evidence against this defendant any acts done or statements

7  made by any members of that conspiracy during the existence of

8  and to further the objectives of the conspiracy.

9          You may consider these acts and statements even if

10  they were done in Mark Ciavarella's absence and without his

11  knowledge.  As with all of the evidence presented in this case,

12  it is for you to decide whether you believe this evidence and

13  how much weight is going to be given to that evidence.  Now, we

14  are in a different area.  Counts 36 to 37, which is even closer

15  to the end, count 36 and 37 of the indictment charge the

16  defendant, Mark Ciavarella, with filing a false tax return

17  which is in violation of federal law, and that's charged from

18  36 to 39 for the years 2003, 2004 and 2005, separate count for

19  each year.

20          In order to find the defendant guilty of this

21  offense, you must find that the government proved each of the

22  following five elements beyond a reasonable doubt:  Mark

23  Ciavarella made and subscribed and filed an income tax

24  document, that the tax return document contained a written

25  declaration that it was and made under penalty of perjury, that

1    the return was false regarding a material matter and, fourth,

2    that Mark Ciavarella did not believe the return document was

3    true and correct as to that material matter, and, fifth, that

4    Mark Ciavarella acted wilfully.

5          The first element is the government has to prove

6    beyond a reasonable doubt that Mark Ciavarella made and

7    subscribed and filed a tax return.  And a tax return is made

8    and subscribed at the time that it was signed and is filed at

9    the time that it's delivered to the Internal Revenue Service.

10   The second element the government has to prove beyond a

11   reasonable doubt that the return document contained a written

12   declaration that it was made under penalty of perjury.

13         To satisfy this element, the government must prove

14   that on its face the return document contained a statement

15   indicating that the return was made under penalty of perjury.

16   Third element, the government must prove beyond a reasonable

17   doubt that the return was false regarding a material matter,

18   and it may be false not only by reason of understatement of

19   income but also because of overstatement of lawful deductions

20   or because deductible expenses are mischaracterized on the

21   return.

22         The false statement in the return must be material.

23   This means that it must be essential to an accurate

24   determination of Mr. Ciavarella's tax liability.  However, the

25   government does not need to prove of the existence of tax

1  deficiency or loss to the government.  Fourth -- fourth element

2  the government must prove beyond a reasonable doubt that Mark

3  Ciavarella did not believe the return document was true and

4  correct as to material matters whether he did not believe --

5  whether he did not believe the return to be true and correct as

6  to material matters may be proven by Mr. Ciavarella's conduct

7  and by all the facts and circumstances surrounding the case.

8          The last count is the first count, which is --

9  identifies earlier conduct or participation in conduct or

10  affairs of an enterprise through a pattern of racketeering

11  activity.  There are elements of that offense, and they are not

12  easy elements.  We will take a break and conclude the charge at

13  that point.

14          (A brief recess was taken.)

15          THE COURT:  The last count in the indictment has two

16  counts.  Count one of the indictment at the beginning charges

17  the defendant with violating the Racketeer Influenced and

18  Corrupt Organizations Act also known as RICO.  Under this

19  statute, it's a federal time for any person who is employed by

20  or associated with an enterprise that was engaged in or affects

21  interstate or foreign commerce, to conduct or participate in

22  the conduct of the affairs of that enterprise through a pattern

23  of racketeering activity.

24          In order to find this defendant guilty of this

25  offense, you must find that the government proved each of the

1  following five elements beyond a reasonable doubt:  The

2  existence of an enterprise, that the enterprise was engaged in

3  or its activities affecting interstate or foreign commerce.

4  You know why that's in there.  That Mark Ciavarella was

5  employed by or associated with that enterprise and that Mark

6  Ciavarella knowingly conducted that enterprise's affairs or

7  that he knowingly participated directly or indirectly in the

8  conduct of that enterprise's affairs.  Fifth, that the

9  defendant knowingly conducted or participated directly or

10  indirectly in the conduct of that enterprise's affairs through

11  a pattern of racketeering activity as alleged in the

12  indictment.

13         I will now explain the law and these particular

14  elements.  First element, the government has to prove beyond a

15  reasonable doubt that the offense charged in count one is the

16  existence of the enterprise as alleged in the indictment.  An

17  enterprise may be a legal entity such as a corporation or

18  partnership, a group of individuals associated and, in fact,

19  although not a legal entity.  In this case the enterprise

20  alleged in the indictment was the Court of Common Pleas for

21  Luzerne County, part of the judicial branch of government of

22  the Commonwealth of Pennsylvania.  Under the law a court may

23  constitute an enterprise.

24         Although the government must prove that Mark

25  Ciavarella was employed by or associated with the enterprise,

1  the enterprise must itself be an entity separate and distinct

2  from the defendant.  Second element, the government must prove

3  beyond a reasonable doubt for the offense charged in count one

4  that the enterprise was engaged in interstate commerce or

5  enterprise's activity affected interstate commerce.  This means

6  the government must prove that the enterprise was involved in

7  or affected in some way trade or business or travel between two

8  or more states.

9        An enterprise is engaged in interstate commerce when

10 itself directly engages in production, distribution or

11 acquisition of services, moneys, goods or other property.

12 Affected by interstate commerce is if its activities in any way

13 interfered with, changed or altered the movement or

14 transportation of flow of goods.  The government must prove

15 that the enterprise's activities had some effect on commerce no

16 matter how minimal or slight.  The government need not prove

17 that Mark Ciavarella knew the enterprise was engaged in or that

18 the enterprise's activity would affect interstate commerce.

19 All the government need -- the government also need not prove

20 that Mark Ciavarella intended to obstruct, delay or interfere

21 with interstate commerce or that the purpose of the alleged

22 crime generally was to affect interstate commerce.

23       Moreover, you don't have to decide whether the effect

24 on commerce was harmful or beneficial.  The government does not

25 have to prove that the pattern or the individual acts of

1  racketeering activity themselves affected interstate commerce.

2  Rather, it is the enterprise and its activities considered as a

3  whole that must show you have that effect.  The third element

4  that the government must prove beyond a reasonable doubt of the

5  offense charged in count one is that Mark Ciavarella was either

6  employed by or associated with the enterprise.  The government

7  need not prove both.

8          If you find that Mark Ciavarella was employed by the

9  enterprise, that is enough to satisfy the element.  I have to

10 tell you that he was a dually elected official and a member of

11 the Court.  The government is also not required to prove that

12 Mr. Ciavarella had a formal managerial position in the

13 enterprise or participated in all its activities.

14         What the government must prove beyond a reasonable

15 doubt is that sometime during the existence of the enterprise

16 as alleged in the indictment Mark Ciavarella was employed by

17 and associated with the enterprise within the meeting of those

18 terms.  Fourth element, the government must prove beyond a

19 reasonable doubt that offense charged in count one that Mark

20 Ciavarella knowingly conducted the affairs of the enterprise or

21 that he knowingly participated directly or indirectly in the

22 conduct of the affairs of the enterprise.

23         In order to prove this element, the government must

24 prove the connection between Mark Ciavarella and the conduct of

25 the affairs of the enterprise or the Court.  The government

111

1    must prove that Mark Ciavarella took some part in the operation

2    or management of the enterprise or the -- he had some role in

3    directing the enterprise's affairs.

4         You could find Mark Ciavarella participated directly

5    or indirectly in the affairs of the enterprise if you find that

6    he was a lower level participant who acted under the direction

7    of upper management knowingly furthering the aims of the

8    enterprise by implementing management decisions or carrying out

9    the instructions of those who control or that Mark Ciavarella

10   knowingly performed acts, functions or duties that were

11   necessary to or helpful to the operation of the enterprise.

12   The fifth element, the government must prove beyond a

13   reasonable doubt that the offense charged in count one is that

14   Mark Ciavarella knowingly conducted the enterprise's affairs or

15   knowingly participated directly or indirectly in the conduct of

16   the enterprise through a pattern of racketeering activity.

17        To establish this element, the government must prove

18   each of the following beyond a reasonable doubt:  That Mark

19   Ciavarella committed at least two of the acts of racketeering

20   activity alleged in the indictment and the last act of

21   racketeering activity occurred within ten years after the

22   commission of the previous act of activity.  Now, in the

23   indictment on Page 12, where it says pattern of racketeering

24   activity, racketeering activity one, there's a total of 13 of

25   them.

1          Racketeering activity one constituted wire fraud.
2    That's why we instructed you on the meaning of wire fraud
3    before we got to this particular count.  Wire transfer totaling
4    $997,600 made in connection with the construction of
5    Pennsylvania Child Care Juvenile Detention Facility.  There's a
6    list of 13 of those separate racketeering activities.  We tell
7    you if he committed at least two of the acts of racketeering
8    activity alleged in the indictment, second, that the acts of
9    racketeering activity were related to each other meaning that
10   there was a relationship between or among the acts of
11   racketeering activity referred to as the relatedness
12   requirement, third, acts of racketeering activity amounted to
13   or posed a threat of continued criminal activity referred to as
14   the continuity requirement, and, fourth, that Mark Ciavarella
15   conducted or participated directly or indirectly in the conduct
16   of the enterprise's affairs through the pattern of racketeering
17   activity.

18          Now, with respect to the second requirement, acts of
19   racketeering activity, that they are related, the acts had some
20   or similar purposes, results, participants, victims or methods
21   of commissions or otherwise interrelated by distinguishing
22   characteristics.  The third requirement the government has to
23   prove that the racketeering acts themselves amounted to
24   continuing racketeering activity or that the acts otherwise
25   posed a threat of continuing racketeering activity.

1          If you look at all or any number of those, you have

2  to decide from that whether there is this continuing activity.

3  Continuing racketeering activity or a threat of continuing

4  activity may also be proved by evidence showing past

5  racketeering activity that by its nature projected into the

6  future with a threat of repetition, for example, when the acts

7  of racketeering activity are part of a long-term association

8  that exists for criminal purposes or when the acts of

9  racketeering activity are shown to be the regular way of

10  conducting the affairs of the enterprise.

11          In deciding whether the government proved the pattern

12  of racketeering activity, you may consider evidence regarding

13  the number of acts of racketeering.  We told you there was 13.

14  You may find that separately performed, functionally different

15  or direct or unrelated racketeering activity form a pattern of

16  racketeering activity if you find that the government proved

17  beyond a reasonable doubt that they were all undertaken in

18  furtherance of one or more of the purposes of the enterprise.

19          Now, to prove the fourth requirement that Mr.

20  Ciavarella conducted or participated in the conduct of the

21  enterprise affairs through a pattern of racketeering activity ,

22  the government must prove that the acts of racketeering had a

23  relationship or meaningful connection to the enterprise.  This

24  relationship or connection may be established by evidence of

25  Mark Ciavarella was enabled to commit the activity by virtue of

1 position with or involved in the affairs of the enterprise or

2 the Court or by evidence that Mark Ciavarella's position or

3 involvement in the enterprise facilitated his commission of the

4 racketeering activity or by evidence that the racketeering

5 activity benefitted the enterprise, was authorized by the

6 enterprise, promoted or furthered the purposes of the

7 enterprise or some other way related to the affairs of the

8 enterprise.

9        Now, racketeering activity as defined by the RICO

10 statues includes any acts that involve or that may be charged

11 as any wide range of crimes under state or federal law.  Count

12 one of the indictment alleges Mark Ciavarella committed 13 acts

13 of racketeering activity, some of which the indictment alleges

14 were committed through acts constituting a violation of

15 multiple crimes under federal or state law.

16        Again, I reiterate that's why we charge you with the

17 earlier counts which can be the basis of racketeering activity

18 in this count.  Now, racketeering acts one, two and three of

19 count one of the indictment allege Mr. Ciavarella committed

20 honest services wire fraud.  These have been previously defined

21 in violation of the federal crimes code.

22        And in order to find that he committed any of these

23 acts of racketeering activity, you must first find that the

24 government proved beyond a reasonable doubt each of the

25 elements of honest services fraud that I previously read to

1  you.  Other racketeering acts alleged in the indictment state

2  that Mr. Ciavarella committed offenses of extortion under color

3  of official right in violation of federal law.  And in order to

4  find he committed any of the acts of racketeering, you must

5  find that the government proved each of the elements of

6  extorsion under the color of official right I previously read

7  to you.  The same is true with racketeering acts alleged in the

8  indictment which constitute bribery under Pennsylvania statute

9  in violation of that statute.  In order to find Mark Ciavarella

10  committed any of these acts, you must find that the government

11  proved beyond a reasonable doubt each of the following

12  elements:  That he solicited, accepted or agreed to accept

13  money from Robert Powell as alleged in the indictment and that

14  the money was solicited or accepted or agreed on as

15  consideration for a violation by Mark Ciavarella of a known

16  legal duty as a judge in the court of common pleas.  And under

17  Pennsylvania law, the judge of the court common pleas has a

18  duty to refrain from being paid or accepting payment as

19  compensation for his official actions of any fee, emolument or

20  perquisite other than his salary and expenses provided by law.

21           Racketeering act 13 in the indictment alleges Mark

22  Ciavarella committed the offense of money laundering, and we

23  defined those terms as well.  The indictment alleges Mark

24  Ciavarella committed these 13 acts stated in count one as

25  racketeering activity.  And as I have instructed, you must find

1  that the government proved beyond a reasonable doubt that he

2  committed at least two of these alleged acts of racketeering

3  activity within the prescribed time period.  You must be

4  unanimous.  You must unanimously -- unanimously find that the

5  government proved beyond a reasonable doubt that Mark

6  Ciavarella committed each of at least two of the same

7  particular acts of racketeering activity.  It's not enough for

8  some members of the jury find that he committed two of the

9  particular racketeering acts alleged while other members of the

10 jury find that he committed different acts.  In order to for

11 you to find him guilty, there must be at least two specific

12 racketeering acts that all of you find were committed by Mark

13 Ciavarella.

14        I have instructed you on the elements of the RICO

15 statute or RICO offense in count one.  A verdict form has been

16 prepared for you to use to record your verdict.  As I explained

17 to you, the indictment alleged that the pattern of racketeering

18 in this case included 13 acts of racketeering activity.

19        As I've explained, to find a pattern of racketeering

20 activity, you must unanimously agree that the government proved

21 beyond a reasonable doubt at least two of the same particular

22 acts of racketeering activity alleged.  The form includes a

23 series of interrogatories for you to answer with respect to

24 count one indicate which acts of racketeering activity, if any,

25 that you unanimously find.  Do not answer these interrogatories

117

until after you reached your verdict.  If you decide the
government has not proved Mark Ciavarella guilty of
Racketeering Influenced and Corrupt Organization or RICO
offense charged in count one, then you do not need to answer
any of these interrogatories.  However, if you find unanimously
that the government proved each of the elements of this offense
beyond a reasonable doubt after you reached and recorded that
verdict on the verdict form, you should answer the
interrogatories.

It's not going to be difficult.  You will be able to
follow it.  You will have a verdict form.  You must decide
whether Mark Ciavarella -- Mark Ciavarella is guilty of this
offense first before answering the interrogatories.  If you
find him not guilty of conducting or participating in the
conduct of the affairs of an enterprise through a pattern of
racketeering activity as charged in count one, please proceed
to the next count.  Do not answer the jury interrogatories.  If
you find Mr. Ciavarella guilty of conducting or participating
in the conduct of the affairs of an enterprise through a
pattern of racketeering activity as charged in count one,
please answer the jury interrogatories before proceeding to the
next count.

Count two charges Mark Ciavarella agreed or conspired
with one or more other persons to conduct or to participate in
the conduct of an enterprise's affairs through a pattern of

118

1  racketeering activity as I've explained that to you.  It's a

2  federal crime for two or more persons to agree or conspire to

3  commit an offense against the United States.  We discussed that

4  reference to some of the other counts.

5          In order to find Mark Ciavarella guilty of conspiracy

6  to conduct or participate in the conduct of an enterprise's

7  affairs through a pattern racketeering activity, you must find

8  that the government proved beyond a reasonable doubt a series

9  of three elements.  First, two or more persons agreed to

10 conduct or participate directly or indirectly the conduct of an

11 enterprise through a pattern racketeering activity.  Mr.

12 Ciavarella was a party, and Mr. Ciavarella joined the agreement

13 or conspiracy knowing of its objective to conduct or

14 participate directly or indirectly in the conduct of the

15 enterprise's affairs through a pattern of racketeering activity

16 and intended to join together with at least one other person to

17 do so.

18          Again, the meaning of elements of enterprise,

19 employed by, or associated with, conduct or participate,

20 directly or indirectly, in the conduct of that enterprise's

21 affairs and through a pattern of racketeering activity are the

22 same as I've explained to you when I laid out the elements for

23 the RICO offense.  However, the RICO conspiracy that I am

24 addressing now in count two is a distinct offense from the RICO

25 offense charged in count one.

1          There are several important differences between

2    these.  One important difference is that unlike the

3    requirements to find Mr. Ciavarella guilty of the RICO offense,

4    in order to find Ciavarella guilty of the conspiracy charge in

5    count two, the government is not required to prove that the

6    alleged enterprise actually existed or that the enterprise

7    actually engaged in or its activities actually affected

8    interstate or foreign commerce.  Rather, because an agreement

9    to commit a RICO offense is the essence of a RICO conspiracy,

10   the government need only prove that Mark Ciavarella joined the

11   conspiracy and that if the object of the conspiracy was

12   achieved, the enterprise would be established and the

13   enterprise would be engaged in or its activities would affect

14   interstate commerce.

15          You may find Mr. Ciavarella guilty of the RICO

16   conspiracy offense if the evidence establishes that Ciavarella

17   knowingly agreed to facilitate or further a scheme which it

18   completed constituted a RICO violation involving at least one

19   other conspirator who would be employed by or associated with

20   the enterprise and would participate in the operation or the

21   management of the enterprise.

22          Finally, in order to find Mr. Ciavarella guilty of

23   the RICO conspiracy charge in count two, the government is not

24   required to prove that he personally committed or agreed to

25   personally commit any of the acts of the racketeering activity.

1  However, the elements must establish that Mark Ciavarella

2  knowingly agreed to facilitate or further a scheme, which if

3  completed would include a pattern of racketeering activity

4  committed by at least one other conspirator.

5          To find Mr. Ciavarella guilty of this conspiracy in

6  count two, you must find that the government proved beyond a

7  reasonable doubt that he joined in that agreement with other

8  persons or persons knowing that the objective or purpose was to

9  conduct or participate directly or indirectly in the conduct of

10 the affairs of the enterprise through a pattern of racketeering

11 activity and intending to join with the other person or persons

12 to achieve the end.

13         In order to convict of this conspiracy, your verdict

14 must be unanimous as to which type of racketeering activity

15 Ciavarella agreed would be committed, for example, at least two

16 acts of honest services fraud or extorsion under color of

17 official right or bribery chargeable under state law or one of

18 each or any combination.

19         A person in -- I am going to address you on aiding

20 and abetting.  Several counts speak of the defendant and

21 Conahan and each aiding and abetting each other.  A person may

22 be guilty of an offense because he personally committed the

23 offense himself or because he aided and abetted another person

24 in committing the offense.

25         A person who has aided and abetted another person

121

1  committing an offense is often called an accomplice.  A person

2  whom accomplice aids and abets is known as the principal.  In

3  this case, the government alleges Mr. Ciavarella aided and

4  abetted Michael Conahan in committing a number of offenses

5  charged in the indictment.

6          In order to find him guilty of any offense because he

7  aided or abetted Michael Conahan in committing the offense, you

8  must find the government proved beyond a reasonable doubt that

9  Michael Conahan committed the offenses charged by committing

10  the elements of the offense charged as I have explained those.

11  Michael Conahan need not have been charged with or found guilty

12  of these offenses.  However, as long as you find the government

13  proved beyond a reasonable doubt that he committed the offense,

14  Mark Ciavarella knew the offense charged was going to be

15  committed was being committed by Michael Conahan and, third,

16  that he knowingly did some act for the purpose of assisting,

17  soliciting, facilitating or encouraging Michael Conahan in

18  committing the specific offense charged, fourth, that Mark

19  Ciavarella acts did in some way, aid, assist, facilitate,

20  encourage Michael Conahan to commit the offense and that Mark

21  Ciavarella's acts need not themselves be against the law.

22          Evidence that Mr. Ciavarella was merely present or

23  was merely a knowing spectator during the commission the

24  defense is not enough for you to find Mr. Ciavarella guilty as

25  an aider and abetter.  If the evidence shows that Mr.

1  Ciavarella knew that the offense was being committed or was

2  about to be committed but does not also prove beyond a

3  reasonable doubt that it was his intent and purpose to aid,

4  assist, encourage, facilitate or otherwise associate himself

5  with the offense, you may not find him guilty of the offense of

6  aiding and abetting.  Now, ladies and gentlemen, I'm not going

7  to review the evidence.  The jury in this case has been very,

8  very alert.

9         In addition to taking the indictment and a copy of

10  the legal charges that I've been reading to you, you will be

11  taking a verdict slip, which is very self-explanatory.  You

12  will have to look at that slip, and you will have to answer the

13  questions guilty or not guilty.  It's pretty well

14  self-explanatory.  Whatever you decide in any of the offenses

15  in addition to some elements where you must be unanimous as to

16  racketeering activity, where two are required, you must be

17  unanimous as to which two.  Your verdict in every case has to

18  be unanimous.  All members of the jury have to agree.  You will

19  go out.

20         You will take the material I am going to give you.

21  The exhibits in this case will be provided for the jury and be

22  brought to the jury room by the bailiff who will be attending

23  probably outside of the -- the opposite door.  There will be

24  writing material.  If you have any questions at any time after

25  you elect a person who presides over your deliberation, the

1  foreperson, lady or man, whoever it is, if you have questions,

2  write them down, knock on the door.  The gentleman the bring

3  the question to the Court.  I will confer with the lawyers.  We

4  will decide how we will answer your questions.  Are there any

5  additions or corrections?

6          MR. HOUSER:  One minor one from the government.  May

7  we approach?

8          (The following discussion took place at sidebar:)

9          MR. HOUSER:  One minor, Judge.  I didn't realize this

10 until I actually started drafting the indictment.  On a wire

11 fraud, the definition of interstate commerce that applies to

12 almost every other statute in federal law is different because

13 under wire fraud the wire has to actually cross a state line

14 not just affect interstate commerce.  I didn't realize until we

15 drafted this indictment.  Your Honor left out a portion of the

16 -- that portion of the instruction.  That's the only request I

17 was going to make is that you clarify that because that is --

18 that is something that from the defense standpoint, they -- I

19 am sure -- they want to have us prove that aspect of it as

20 well.  And this is -- this is the request we would ask that you

21 read the -- this paragraph right here, and that's it because

22 that explains it has to cross a state line.

23         THE COURT:  It seems to contradict everything else we

24 said except in the case of wire fraud.

25         MR. HOUSER:  But in wire fraud it's an additional

124

1  part of that.  It's not affecting interstate commerce.  It has

2  to cross the state line, the wire itself.  That's different

3  about the wire fraud statute.

4          THE COURT:  You concur in that?

5          MR. FLORA:  I concur in that, Your Honor.  That was

6  my understanding, too.  Bill, you have --

7          MR. RUZZO:  I have something, Your Honor.  The

8  government has charged bribery -- charged Mark with bribery

9  under state law, state law bribery.  Their allegations are that

10 it's -- that Powell's victim -- Powell was a victim of

11 extorsion.  There's an extorsion statute in Pennsylvania

12 distinct from the bribery statute.  We think all of those

13 racketeering acts should be dismissed, taken off the verdict

14 slip since the -- they charged the wrong statute.

15         MR. HOUSER:  That's inaccurate, Judge.  The RICO

16 statute permits us to charge any of the acts as specified as

17 unlawful activity, and this is bribery under state law.  And

18 it's titled that in the statute book.

19         THE COURT:  In the indictment, too.

20         MR. HOUSER:  It is, yes.

21         MR. RUZZO:  It is in the indictment.

22         THE COURT:  All right.  I am not going to touch the

23 subject, but you're covered.

24         MR. FLORA:  Judge, just finally on sending the

25 indictment out, we met with the government, and we agree with

125

1  the government that with regards to Page 36, on the top of Page

2  37 the highlighted section should be redacted.  We agreed with

3  that and --

4          THE COURT:  What are those?

5          MR. HOUSER:  It's -- there's some matters we didn't

6  prove at trial, and so what -- we have it done already, Judge.

7  We have the redactions.

8          THE COURT:  Okay.

9          MR. FLORA:  Page 38 there's a highlighted section

10  they marked.  We agree that should be redacted.  Pages 71

11  through 74 to the end they agreed they should be excluded

12  completely.  We agree with that.  For purposes of the record,

13  we will Mark this as Defendant's Exhibit 99 so we are

14  completely covered.

15          THE COURT:  That's it.

16          MR. FLORA:  Looking at the indictment, what we

17  couldn't agree to, it's our position Pages 1 through 11 should

18  be taken out of the indictment because that really goes to

19  their surrounding theory surrounding the case and everything.

20  It doesn't give the jury guidance as to the specific payments

21  or anything.  There was a lot of additional things in there

22  which is almost like argument more than anything else.  We also

23  believe --

24          THE COURT:  I don't disagree with that except the

25  continuity is there with the indictment purpose.  That's the

1    only reason I am letting it go.

2           MR. FLORA:  Right.  Pages 31 through 39 completely we

3    believe should be taken out for the same reason.  Finally, Your

4    Honor, Pages 42 through 44 of the indictment deals with count 7

5    through 10.  And that deals with the filing of the financial

6    disclosure statements with the AOPC.  I know at oral argument

7    you indicated that you would take that under advisement.  I

8    believe you probably denied even though you may not have stated

9    it of record.

10          We believe, Your Honor, that -- it's clearly improper

11   for the reasons stated to even submit those counts to the jury.

12          THE COURT:  They are denied if I haven't.  We've

13   taken everything out that they wanted out?  The only trouble

14   with that is I marked for the jury's convenience -- I don't

15   think they are going to do an awful lot today anyway.  So we

16   will give them that.

17          (The discussion at sidebar concluded.)

18          THE COURT:  In charging you on the wire fraud, it's a

19   legal technicality, but the government asks that I read -- the

20   defense agreed, too.  To transmit by means of wire radio or

21   television communication in interstate commerce means to send

22   from one state to another by means of telephone or telegraph

23   lines or by means of radio or television.  This phrase includes

24   a telephone conversation by a person in one state with a person

25   in another state or electronic signal sent from one state to

1  another such as by fax or financial wire.

2         Use of the internet to send message such as e-mail or

3  to communicate or a website may constitute the wire

4  transmission in interstate commerce.  That it?

5         MR. HOUSER:  Thank you, Your Honor, yes.

6         THE COURT:  Now, I told you will have writing

7  materials.  I must tell the alternate jurors -- everybody well

8  in the jury box?  Everybody feeling fine?  Okay.  Under those

9  circumstances, only 12 people can deliberate.  And jurors No.

10  13, 14, 15 and 16 will be excused.  You can get your materials

11  before you leave, and it's your choice once you're excused --

12  you're free to go.  Whether you wish to discuss your role with

13  anyone is your business.  Whatever you decide to do -- I will

14  suggest you not -- but you don't have to accept my suggestion,

15  okay.  All this material will be brought in.

16         If you decide once you organize and have your

17  materials -- if you have a day of it, let us know.  In which

18  case, you will be excused.  We will ask the jury to return

19  tomorrow morning at 8:30 when you have been returning, and you

20  will continue to deliberate.  At this stage, I have to add that

21  you be admonished.  If you separate for the night or at any

22  time during the course of your deliberations, you are not to

23  talk to anyone about this case or to talk even between

24  yourselves about this case.

25         And the only time you are to talk to each other about

128

1  this case is when you're all together.  Once any of you have

2  been separated, it would be inappropriate for to you do so.  So

3  please remember that admonition.  And when you go home again,

4  all the more reason no one should communicate with you, nor you

5  with anyone else.  And certainly in all events you shouldn't

6  consider anything but what we instructed that you can legally

7  consider, and that is, only the evidence that you heard

8  presented for you to consider in this trial.  Let us know what

9  you decide to do.  And again, I tell 13, 14, 15 and 16 if you

10  have any material in there, get it.  I want to thank you for

11  your patience and your service.  You've been true to your oath

12  to this point, okay.

13             (The tipstaff was sworn at this time.)

14             (The jury left to deliberate at this time and

15  returned February 17, 2011 and February 18, 2011 to continue

16  deliberations.)

17

18

19

20

21

22

23

24

25

129

1                    REPORTER'S CERTIFICATE

2

3        I, LAURA BOYANOWSKI, Official Court Reporter for the

4   United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                      _____
                        Laura Boyanowski, RMR
15                      Official Court Reporter

16  REPORTED BY:

17       LAURA BOYANOWSKI, RMR
         Official Court Reporter
18       United States District Court
         Middle District of Pennsylvania
19       Scranton, PA  18503

20

21       (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
    the direct control and/or supervision of the certifying
22  reporter.)

23

24

25